OPINION OF THE COURT
Louis C. Benza, J.
Brian Bordes escaped from the Kings Park Psychiatric Center (hereinafter referred to as Kings Park) on May 17, 1979. The claimants, Suffolk County Police Officers, were seriously injured by Bordes when they attempted to apprehend him on July 15, 1979. The claims seek recovery for these personal injuries on two independent theories, common-law negligence in permitting a dangerous patient to escape, and violation of applicable State regulations requiring that notice of the escape be given to those threatened by the escapee.
Brian Bordes, who was 23 years old at the time of this violent and disastrous attack on the claimants, had a long history of mental illness and antisocial behavior. According to the Kings Park hospital record, Bordes’ first admission to said hospital was on October 29, 1974; subsequently, over the next several years, he was hospitalized an additional four times. On February 2, 1979, Kings Park applied to the County Court in Central Islip for a six-month order of retention which was granted. Said order was to expire on August 1, 1979. From the date of Bordes’ first admission at Kings Park to May 17, 1979, the date of his last escape from Kings Park, Bordes escaped a total of seven times, three times by bending the bars on the porch of ward 93, where he was maintained under close observation (emphasis added by court).
On May 30, 1979, while Bordes was still on escape status from Kings Park, his mother and grandmother advised Dr. Jasen, a Kings Park psychiatrist, that Bordes was with his father in Florida. They gave the father’s Florida address, which was written in the hospital record.
Dr. Messih testified that Bordes was discharged from escape status on June 16, 1979, pursuant to the policy manual in existence on that date. When asked what provision of the policy manual he used when discharging Bordes, the doctor stated that if the patient was on an escape status and did not return he was to be discharged 30 days from the date of escape or at the expiration of his commitment, "whichever comes first”.
*900 Department Policy Manual § 5300 — "Leave Without Consent”, defines pertinent portions of the procedures dealing with patients on escape status which the court finds were not followed by the administration in Bordes’ case.*
The record shows that a few days after June 16, the date of discharge, the Maine Police called Dr. Messih to advise that they had found Bordes wandering in the woods. Dr. Messih advised the Maine Police that Bordes was a patient at his hospital who had escaped and was discharged and that they, the Maine Police, should bring him to a State hospital. It is apparent that if any such hospitalization did occur it did not last for long, for we find Brian Bordes appearing on July 15 at his grandmother’s house in Commack, New York.
On that day, a Sunday morning, Officer Joseph Santangelo of the Suffolk County Police received a phone call at police headquarters from a Mr. Vezzani, Brian Bordes’ uncle. Mr. Vezzani advised Officer Santangelo that his nephew Brian Bordes was at his grandparents’ home and that the caller feared for their welfare. Mr. Vezzani also advised Officer Santangelo that Brian Bordes was an escapee from Kings Park and that on other occasions he had fled when he saw uniformed officers. Before going to apprehend Bordes, Officer Santangelo called the Suffolk County teletype unit to check if there were any alarms in the patient-escapee file for Bordes. There was no outstanding alarm.
Officer Santangelo and his partner, Officer Kirschenheiter, went to Bordes’ grandmother’s house and found Bordes sitting on a couch in the grandmother’s living room reading a newspaper. Officer Santangelo went to one side of the room and his partner to the other side. When Officer Santangelo identified *901 himself with his police shield, Bordes became disruptive and threatening. He took a knife from his pocket and walked toward Officer Kirschenheiter. Officer Kirschenheiter sprayed mace into Bordes’ face; it had no effect, and Bordes continued to advance on him. Officer Santangelo. pulled his revolver and ordered Bordes to drop his knife. Bordes turned on Officer Santangelo and Officer Santangelo shot Bordes five times. The bullets did not stop Bordes and he leaped on Officer Santangelo and proceeded to inflict serious injuries with his knife. Only after a further scuffle with Officer Kirschenheiter in which he, too, was injured, was Bordes subdued and handcuffed.
Claimants assert that the liability of the State has been established upon two independent theories. The first is that the State negligently permitted the patient to escape and failed to comply with the cited State regulations regarding escaped patient recovery, with such failures being the proximate cause of claimants’ injuries. Secondly, it is asserted that the patient had expressed direct threats to kill police officers, and therefore police were members of the class entitled to notification under 14 NYCRR 37.3, that said notice was not given and the State breached a special duty to the Suffolk County Police, in general, and claimants, in particular.
In disputing liability, the State asserts that claimants have failed to establish that the elopement of the patient was due to the defendant’s negligence; that the defendant neither owed nor breached any special duty to claimants; that the State facility promptly notified the police and relatives of the escape; that the elopement was not the proximate cause of claimants’ injuries; and that claimants, as police officers, assumed the risk of harm in the performance of their duty.
A review of the facts surrounding Brian Bordes’ several admissions to Kings Park leads the court to the inescapable conclusion that the State was negligent in failing to prevent the escape of Brian Bordes and in failing to take the proper steps to apprehend him after his escape of May 17, 1979 (Dunn v State of New York, 29 NY2d 313; Thall v State of New York, 69 Misc 2d 382, affd 42 AD2d 622). Based on the manner in which Bordes was confined, given his many successful escapes, three of which were accomplished in the same manner, the record clearly indicates a casual, almost cavalier attitude, on the part of the State toward the safety of the public as it related to the custody and supervision of this dangerous individual. The administration of this hospital in *902 dealing with Bordes during his confinements was almost reckless in failing to more closely supervise him. The Regulations of the Department of Mental Hygiene in effect at the time of Bordes’ last elopement dealing with the apprehension of escaped patients were clearly ignored or improperly interpreted by Dr. Messih, contributing further to the prevention of the apprehension of Bordes. Dr. Messih’s discharge of Bordes 30 days after his escape, while Bordes was still subject to the February 2, 1979 order of retention, was also not in accordance with the regulations.
In no respect was Bordes properly discharged on June 16, 1979, considering either the original expiration date of August 1, 1979, or the tolling of said date as a result of the application of the above rule. Therefore, at the time of the attack on claimants, Bordes was still a patient of the hospital on escape status. In any event, patient or not, the failure of the hospital to take more positive actions to apprehend Bordes when advised of his presence in Florida and Maine was clearly in contravention of the rules, given the known dangerous propensities of this patient. Accordingly, the court finds that the State was negligent in failing to prevent the escape of Brian Bordes and, later, in failing to take the proper steps to apprehend him (Dunn v State of New York, supra; Thall v State of New York, supra). Further, the court finds that this negligence was a proximate cause of the claimants’ injuries, which injuries were reasonably foreseeable in view of Bordes’ propensity to violence (Dunn v State of New York, supra; Thall v State of New York, supra).
The question remaining, however, is whether the public policy of this State prohibits a policeman who is injured in the line of duty from recovering for a negligent act which creates the very need for his presence. Stated another way, and within the context of the instant claim, may claimants here, Suffolk County Police Officers, called on in the normal course of their duties to apprehend an individual known to them to be an escaped mental patient, directly confront this individual, sustain injuries in an attempt to apprehend him, and recover for those injuries, based on the negligence of a third party which allowed this individual to be there in the first place. In this court’s view, they may not.
Although we find a scarcity of New York case law addressing this issue, the decision in McGee v Adams Paper & Twine Co. (26 AD2d 186, affd 20 NY2d 921) prohibited recovery by firemen and policemen for injuries sustained as a result of *903 negligence which created the need for "the special services for which they are trained and paid” (McGee v Adams Paper & Twine Co., supra, p 190). The basis of that decision as well as the treatises and cases cited in support of that holding are founded on the theory of assumption of risk (McGee v Adams Paper & Twine Co., supra, p 190).
In addressing the alleged negligence of the defendant building owners and occupiers in causing the subject building fire, the court in McGee (supra) held that firemen and fire patrolmen are bound to anticipate that many fires are occasioned by negligence but that "liability may not be predicated on a theory that the building owner, lessee or occupant owes a duty to paid firemen or to underwriter fire patrolmen to exercise care to eliminate a need for the special services for which they are trained and paid. Once a fire starts and the firemen or fire patrolmen arrive on the scene, they assume the usual risks inherent in their work”. (McGee v Adams Paper & Twine Co., supra, p 190; see also, Walters v Sloan, 20 Cal 3d 199, 571 P2d 609.)
The court did note that liability of a landowner or occupier could arise, however, not based on their causing the fire, but based on the conditions of the premises and the resulting duty to warn, owing to the special status of the fireman or police officer as he entered the land (see, McGee v Adams Paper & Twine Co., supra, p 190; Schwab v Rubel Corp., 286 NY 525; Jenkins v 313-321 W. 37th St. Corp., 284 NY 397; Meiers v Koch Brewery, 229 NY 10; Beedenbender v Midtown Props., 4 AD2d 276). Liability could also be found if created by a statutory authority (Farley v Mayor, Aldermen & Commonalty, 152 NY 222; Sicolo v Prudential Sav. Bank, 2 Misc 2d 289, affd 4 AD2d 790). In those cases where liability is founded on a breach of duty created by statute, it must be established that the policeman, while discharging his duty, is within the class of persons protected by the statute (Racine v Morris, 136 App Div 467). Because the decision in McGee (supra) was founded on the theory of assumption of risk, however, which defense is no longer a complete bar to recovery in personal injury actions (CPLR art 14-A), the court must look to the continued viability of the holding in McGee (supra), in light of both this statutory enactment and the decision in Basso v Miller (40 NY2d 233), which enunciated the single standard of care, regardless of status.
The public policy statements prohibiting a policeman from recovering for injuries sustained as a result of a negligent act *904 which creates the occasion for his presence were not specifically stated in McGee (supra). They are found in those provisions of the American Law Reports and sister State decisions cited in McGee (supra), for the proposition that firemen and policemen cannot recover on the theory of assumption of risk. In Krauth v Getter (31 NJ 270, 157 A2d 129) cited in McGee (supra), and extensively elsewhere, Chief Justice Weintraub rejected the status of "sui generis” given to firemen who enter private property pursuant to their public employment (see, Beedenbender v Midtown Props., supra), stating "[h]is status [fireman plaintiff] being sui generis, justice is not aided by appending an inappropriate label and then visiting consequences which flow from a status artificially imputed” (Krauth v Getter, 31 NJ, at p 273, 157 A2d, at p 130, supra). The court further questioned recovery based on the degree of culpability. "In the context of the policy considerations which underlie the rule of non-liability for negligence with respect to the origination of a fire, it is debatable whether degrees of culpability are at all pertinent” (Krauth v Getter, 31 NJ, at p 277, 157 A2d, at p 132, supra).
The court then laid down the test to determine under what circumstances should the owner or occupier respond to the injured fireman. "That the misfortune here experienced by a fireman was well within the range of foreseeability cannot be disputed. But liability is not always coextensive with foreseeability of harm. The question is ultimately one of public policy, and the answer must be distilled from the relevant factors involved upon an inquiry into what is fair and just” (Krauth v Getter, 31 NJ, at p 273, 157 A2d, at p 130, supra). After determining that "assumption of risk” in this context (as it was in McGee v Adams Paper & Twine Co., 26 AD2d 186, supra) means that the defendant did not breach a duty owed rather than the fireman was guilty of contributory fault in responding to his public duty, the court gave its rationale for its public policy pronunciation. "Stated affirmatively, what is meant is that it is the fireman’s business to deal with that very hazard and hence, perhaps by analogy to the contractor engaged as an expert to remedy dangerous situations, he cannot complain of negligence in the creation of the very occasion for his engagement. In terms of duty, it may be said there is none owed the fireman to exercise care so as not to require the special services for which he is trained and paid. Probably most fires are attributable to negligence, and in the final analysis the policy decision is that it would be too *905 burdensome to charge all who carelessly cause or fail to prevent fires with the injuries suffered by the expert retained with public funds to deal with those inevitable, although negligently created, occurrences. Hence, for that risk, the fireman should receive appropriate compensation from the public he serves, both in pay which reflects the hazard and in workmen’s compensation benefits for the consequences of the inherent risks of the calling” (Krauth v Geller, 31 NJ, at pp 273-274, 157 A2d, at p 131, supra).
New York decisions prior to the enactment of CPLR article 14-A also recognized that, under certain circumstances, the application of the doctrine of assumption of risk acted to negate the duty owed by the defendant, rather than to impart negligent conduct to the plaintiff.
"The doctrine of assumption of risk lies in the maxim, volenti non fit injuria. Based as it is upon the plaintiff’s assent to endure a situation created by the negligence of the defendant, it relieves the defendant from performing a duty which might otherwise be owed to the plaintiff * * * In such case no breach of duty by the defendant is shown and consequently no negligence” (McEvoy v City of New York, 266 App Div 445, 447, affd 292 NY 654).
Even with the enactment of CPLR article 14-A, the assumption of risk doctrine still may act, however, to negate the defendant’s duty in its entirety, serving as a complete bar to recovery (Arbegast v Board of Educ., 65 NY2d 161; see also, Akins v Glens Falls City School Dist., 75 AD2d 239, revd on other grounds 53 NY2d 325). "When the Legislature adopted a doctrine of pure comparative negligence, it explicitly melded contributory negligence and assumption of risk into the term 'culpable conduct’ and determined that such conduct was to be considered in measuring the amount of diminution of any damages a plaintiff might otherwise be entitled to recover (CPLR 1411). However, while the statute undoubtedly eliminated assumption of risk as a complete defense to the same extent that a plaintiff’s own negligence was discarded as an absolute barrier to recovery, the doctrine may still possess some of its former vitality in the strict sense of negating a defendant’s duty [citations omitted]” (Akins v Glens Falls City School Dist., supra, p 240).
Whether policemen and firemen assume the risks inherent in their professions expressly, within the context of Arbegast (supra), must be answered in the affirmative, based on the *906 nature of their duties (McGee v Adams Paper & Twine Co., 26 AD2d 186, supra; Krauth v Getter, 31 NJ 270, 157 A2d 29, supra) and, as relevant to the instant claim, the statutory-directive that police officers shall assist in the apprehension of escaped mental patients (Mental Hygiene Law § 29.19). Indeed, it would serve only to frustrate the very purpose of maintaining a force of paid, professional policemen and firemen if a citizen were made to first obtain the "express consent” of said professional, relieving the citizen of an alleged duty, before requesting their assistance (Arbegast v Board of Educ., supra).
In California, where the rule enunciated in McGee (supra), and Krauth (supra), is given the label the "fireman’s rule,” the Supreme Court in Walters v Sloan (20 Cal 3d 199, 571 P2d 609, supra), applied the doctrine to a policeman who was injured when he attempted to arrest a minor who had become drunk at a party given in defendant’s home. In denying recovery the court stated the basic rule, "The fireman’s rule provides that negligence in causing a fire furnishes no basis for liability to a professional fireman injured fighting the fire” (Walters v Sloan, 20 Cal 3d, at p 202, 571 P2d, at p 610, supra). Firemen, " 'whose occupation by its very nature exposes them to particular risks of harm, " 'cannot complain of negligence in the creation of the very occasion for [their] engagement.’ ” ’ [citations omitted]” (Walters v Sloan, 20 Cal 3d, at p 202, 571 P2d, at p 610, supra). The rule is applicable to policemen as well as firemen (McGee v Adams Paper & Twine Co., supra). The rule which was established almost 100 years ago has received recognition in many sister States as well as by noted treatises on tort liability (Walters v Sloan, supra, citations at p 204, including McGee v Adams Paper & Twine Co., supra). The rule was tested against the single standard of care established in California by Rowland v Christian (69 Cal 2d 108, 443 P2d 561 [1968]), a case cited in Basso v Miller (40 NY2d 233, supra), as authority for the adoption of that rule in New York. The court in Walters (supra) refused to accept the changes made by Rowland (supra), as affecting the fireman’s rule. "While modernizing has brought the law of landowner liability into accord with current concepts of tort liability by eliminating formalistic categories—invitees, licensees, trespassers (see Rowland v. Christian [supra])—the fireman’s rule is not based on such categorizations * * * The rule finds its clearest application in situations like that before us — a person who, fully aware of the *907 hazard created by the defendant’s negligence, voluntarily confronts the risk for compensation” (Walters v Sloan, 20 Cal 3d, at p 205, 571 P2d, at pp 611-612, supra).
The denial of recovery for injuries to policemen caused by another’s negligence which creates the very occasion for their engagement cannot be said to violate our concepts of justice. The many benefits available to policemen to compensate them for the hazards they face, fully justify, for sound public policy reasons, denial of double recovery from the public trough. In view of General Municipal Law § 207-a, the agency paying these benefits would have to be reimbursed by the tort-feasor, thus in any event denying the injured party much of the recovery.
In the present case claimants also contend that the State violated a statutory duty owed to them in that they failed to warn the police department that Bordes had threatened to kill police officers. While this theory of liability is a noted exception to the general "fireman’s rule” (Walters v Sloan, supra; McGee v Adams Paper & Twine Co., 26 AD2d 186, supra) and, under New York cases, may provide a basis for finding liability (Racine v Morris, 136 App Div 467, supra), the court finds that police officers were not within the class protected by the regulation. To hold otherwise would be to contravene those provisions of the regulations which require that police officers "must be called upon if the patient is on escape status. In accordance with the Mental Hygiene Law, it shall be the duty of any such officer to assist any representative of a department facility to take into custody any person who has been reported on escape therefrom”. It would strain statutory interpretation to agree that a regulation or statute seeking to warn an individual of a specific danger would at the same time mandate this individual to seek out and apprehend that very danger to prevent injury, ostensibly to himself. Even if the statute did encompass policemen in the class of persons to be notified, however, the court finds that said notification was in effect made. It would have been superfluous for the Kings Park personnel, who were initially advised of Bordes’ threats to police by the police themselves, to have to renotify the police, upon Bordes’ escape, about the same threats. This is particularly true where, as here, the information was not only transmitted verbally by the police department to the hospital, but was contained in the police report prepared the day Bordes was brought to Kings Park. Accordingly, the court *908 finds no liability based on a violation of these regulations (Racine v Morris, supra).
Extensive research has failed to yield any New York cases within the four corners of the facts in the instant claim (cf. Miller v State of New York, claim No. 64337, filed Feb. 25, 1985, Hanifin, J.). Those which allowed recovery for injuries sustained by policemen and firemen in the course of their duties (Buckley v City of New York, 56 NY2d 300; Poniatowski v City of New York, 14 NY2d 76) did not involve injuries sustained as a direct result of the negligence of a third party, which act brought the policeman or fireman into the confrontation. To broaden the limited areas of recovery in. Buckley (supra), and Poniatowski (supra), would be to impose on the public a duty to provide a policeman with a work environment free from potential danger.
Public policy is better served by the continuation of the fireman’s rule in New York and, as the injuries sustained by the claimants were a direct result of the negligence which occasioned their presence at the place of the occurrence, their claims are dismissed.
All motions made at trial and not hereinbefore decided are now denied.
The clerk of the court is directed to enter judgments in favor of the defendant, the State of New York, against the claimants, Officers Santangelo and Kirschenheiter, dismissing the claims on the merits in accordance with the foregoing, which constitute the written decision of the court pursuant to CPLR 4213.
[Portions of opinion omitted for purposes of publication.]

 Subdivision (2) of paragraph (C) of the manual, "Patient Status Changes”, indicates the changes in status, if any, for escaped patients at specified time intervals. Patients admitted pursuant to the CPL under temporary or final orders of observation, or under orders of commitment or retention, or dangerous patients, are to be maintained on escape status throughout the period of escape, which period is to interrupt the period specified in the order, "no matter how long this period lasts” (subpara [d]).
Subdivision (3) of paragraph (C) states that "Reasonable Efforts to Locate the Patient shall continue as long as required by the patient’s condition regardless of the status originally or subsequently assigned.”
Subdivision (1) of paragraph (C) provides for immediate action, where a Criminal Procedure Law patient escapes, in the way of notifying the committing court, the city or State Police and other governmental agencies (subpara [h]); and, if it is known that the patient is residing outside the State, notifying the Interstate Mental Health Compact (subpara [j]).