HINKELMAN v BORGESS MEDICAL CENTER

Docket No. 81284. Submitted October 9, 1986, at Grand Rapids. Decided January 21, 1987. Leave to appeal applied for.

Virginia Hinkelman and Daniel Travis lived together in early 1978. As time passed, Travis began exhibiting psychological problems and their relationship deteriorated. At Hinkelman's request, Travis sought counseling and was subsequently referred to psychiatrist Charles Overbey. Overbey, who was on the staff of Borgess Medical Center, approved Travis' admission to the Borgess psychiatric unit as an informal, voluntary patient on a couple of occasions. Travis always left the hospital shortly after being admitted. Travis' condition continued to deteriorate and he assaulted Hinkelman once at the hospital and broke into her home and raped her on another occasion. The incidents were reported to the police and warrants were issued charging Travis with assault and battery and criminal sexual conduct. Travis was arraigned on the assault and battery charge and was held in the Kalamazoo County Jail until he was released on a $1,000 personal recognizance bond. Travis subsequently abducted Hinkelman from her place of employment, Kalamazoo College, fatally shooting one of her co-workers in the process. During police pursuit, Travis shot Hinkelman and then killed himself. Hinkelman died from her wounds. Terry L. Hinkelman, administrator of the estate of Virginia C. Hinkelman, deceased, filed a wrongful death action against Kalamazoo College and Borgess Medical Center in Kalamazoo Circuit Court. The action against Kalamazoo College was settled. The claims against Borgess focused upon the hospital's failure to restrain Travis when he sought to leave the hospital

REFERENCES

Am Jur 2d, Hospitals and Asylums §§ 16.5, 28.

Am Jur 2d, Incompetent Persons § 33

Am Jur 2d, Negligence §§ 33 et seq.; 54 et seq.

Am Jur 2d, Physicians, Surgeons, and Other Healers §§ 158-170.

Liability of one treating mentally afflicted patient for failure to warn or protect third persons threatened by patient. 83 ALR3d 1201.

See also the annotations in the Index to Annotations under Hospitals; Negligence; Psychiatry and Psychology.

and on its failure to warn Hinkelman of Travis' dangerousness. Borgess Medical Center filed a motion for summary judgment alleging that plaintiff failed to state a claim upon which relief could be granted and that there was no issue as to any material fact. The court, Robert L. Borsos, J., granted the motion, holding that Borgess had no duty to warn others of Travis' dangerous propensities, was not negligent in permitting Travis to leave the hospital, that Borgess had no duty to petition for Travis' commitment, and that Borgess was not negligent in failing to render an evaluation of Travis. Plaintiff appealed.

The Court of Appeals *held:*

1. There was no special relationship between Borgess and Travis which would impose a duty on the hospital to warn others as to Travis' dangerous propensities. Furthermore, since Hinkelman already knew of the danger, the duty to warn, even assuming the existence of a special relationship giving rise to a general duty to warn, did not arise.

2. Borgess had no duty to keep Travis hospitalized. Travis was a voluntary patient; therefore his hospitalization or freedom was subject to his own volition. Borgess cannot be charged with the consequences of Travis' decision to leave.

3. Borgess had no duty to seek involuntary commitment for Travis.

Affirmed.

1. MENTAL HEALTH — PSYCHIATRIC TREATMENT — DUTY TO WARN — THIRD PERSONS — QUESTIONS OF LAW.

Michigan imposes a duty upon psychiatrists, psychiatric hospitals, and other entities which undertake to render psychological treatment, to protect readily identifiable persons from the dangers posed by patients; whether the facts in a particular case merit imposition of this duty is a question of law.

2. NEGLIGENCE — HOSPITALS — PHYSICIANS AND SURGEONS — PRINCIPAL AND AGENT — VICARIOUS LIABILITY — ESTOPPEL.

A hospital generally is not vicariously liable for the negligence of a physician who is an independent contractor and who merely uses the hospital's facilities to render treatment; however, if a patient looks to the hospital to provide treatment and there is a representation by the hospital that treatment would be afforded by physicians working there, an agency by estoppel can be found; the critical question is whether the patient looked to the hospital for treatment or merely viewed the hospital as the place where his physician would render treatment.

3. MENTAL HEALTH — PSYCHIATRIC TREATMENT — HOSPITALS — DUTY
      TO WARN — THIRD PERSONS.

   A psychiatric hospital has no duty to warn a person readily
   identifiable as foreseeably endangered by the conduct of one of
   its patients where that person already knows of the danger.

4. MENTAL HEALTH — VOLUNTARY PSYCHIATRIC TREATMENT — TERMI-
      NATION OF TREATMENT — HOSPITALS.

   A person undergoing voluntary psychiatric treatment at a hospi-
   tal is free to terminate treatment and leave the hospital at any
   time.

5. MENTAL HEALTH — PSYCHIATRIC TREATMENT — MANDATORY HOSPI-
      TALIZATION.

   Mandatory hospitalization of psychiatric patients by hospitals
   applies only to certain hospitals designated by the Department
   of Mental Health (MCL 330.1423; MSA 14.800[423]).

*Sloan, Benefiel, Farrer, Newton & Glista* (by
*Gary C. Newton*), for plaintiff.

*Dykema, Gossett, Spencer, Goodnow & Trigg* (by
*Robert N. Hammond* and *John A. Ferroli*), for
defendant.

Before: MACKENZIE, P.J., and T. M. BURNS and
P. R. JOSLYN,* JJ.

P. R. JOSLYN, J. Plaintiff Terry Hinkelman, as
administrator of the estate of Virginia Hinkelman,
appeals from an order of summary judgment on
behalf of defendant Borgess Medical Center. This
case requires us to explore the extent to which
liability can be imposed on a psychiatric treatment
facility for injuries caused to third persons by the
actions of a psychiatric patient.

In early 1978, decedent Virginia Hinkelman and
Daniel Travis lived together. However, as time
passed, Travis became suspicious and possessive of
Hinkelman. In June, Travis obtained counseling

---

* Circuit judge, sitting on the Court of Appeals by assignment.

through a nonprofit consultation center. He attended counseling sessions at the center on four occasions in July, August and September of 1978. Travis' condition deteriorated, and he was referred to psychiatrist Charles Overbey. That same month, Hinkelman attempted to terminate her relationship with Travis, and Travis moved out of the Hinkelman home.

Dr. Overbey saw Travis, as a private patient, in his office at Bronson Medical Center on October 5, 1978. Dr. Overbey determined that Travis had a personality disorder with paranoid feelings and recommended that Travis take medication and continue counseling. However, at that time, Overbey saw nothing that merited institutionalizing Travis.

On October 8, 1978, Travis appeared at Hinkelman's parents' home and refused to leave until Hinkelman spoke with him. Hinkelman agreed to accompany Travis to Borgess Medical Center so that he would admit himself to the Borgess psychiatric unit.

Travis was admitted to Borgess, through the emergency room, as an informal, voluntary patient. His admission was approved by Dr. Overbey. At approximately 6:00 P.M., Travis and Hinkelman were escorted to the psychiatric unit.

According to the deposition testimony of hospital personnel, Travis did not want to stay, but Hinkelman begged him to remain. Hinkelman expressed her fear of Travis, and Travis became angry at her. The two retired to a conference room, and a short time later Hinkelman screamed. A hospital technician and a nurse ran into the conference room, where Travis was choking Hinkelman. Travis left, while threatening the nurse. Hinkelman called the police, and hospital security was also summoned.

Travis began looking for Hinkelman, and a hospital nurse asked him to leave. Travis signed out of the hospital. Travis' departure was noted on his medical chart as "against medical advice."

Initially, Hinkelman was reluctant to press charges, but on October 9, 1978, Travis appeared at Hinkelman's home and apparently threatened her. On October 10, Hinkelman recontacted the police and expressed her desire to prosecute. A warrant for Travis' arrest was issued on October 11, 1978.

Also on October 9, 1978, Travis presented himself for readmission to Borgess Medical Center. Dr. Overbey again approved the admission. Travis was given antipsychotic medication pursuant to Overbey's prescription twice that afternoon. At about 4:00 P.M., Travis' history was taken by a hospital social worker. The social worker concluded that Travis was unstable, violent and resistive to authority.

At about 7:30 P.M. that evening, Travis surreptitiously left the hospital. He called the hospital and stated that he would not return. According to nurse Jo Tiedeck, Travis sounded angry but controlled. Travis said that he would get his things from Hinkelman's home and then leave her alone.

On October 12, 1978, Travis made an annoying telephone call to Hinkelman. The Kalamazoo Township Police Department was notified and investigated the incident.

On October 19, 1978, Travis broke into Hinkelman's house and raped her. The incident was reported to the Kalamazoo Police. The next day, a warrant was issued for Travis' arrest for criminal sexual conduct. The warrant was served on Travis while he was being arraigned on the assault and battery charge.

Between October 20 and October 24, 1978, Tra-

vis was incarcerated in the Kalamazoo County Jail. During that time, he was examined by a psychiatrist. The psychiatrist concluded that Travis was not suffering from any mental illness, but suffered from a personality disorder which originated in his early life. The psychiatrist opined that there was no question that Travis was dangerous based on the fact that he had choked Hinkelman. However, during the examination, Travis had made no threats with regard to Hinkelman. Instead, he had stated that he loved her and did not want to hurt her.

On October 24, 1978, Travis' court-appointed attorney moved for a psychiatric evaluation of Travis to determine his competency to stand trial. The motion was granted. However, on the same day he was released on a $1,000 personal recognizance bond.

On November 3, 1978, Travis abducted Hinkelman from her place of employment. During the abduction, Travis shot and fatally wounded one of Hinkelman's co-employees. During the police pursuit, Travis shot Hinkelman and then killed himself. Hinkelman subsequently died from her wounds.

The instant suit for wrongful death was commenced on October 2, 1980. Plaintiff's original complaint alleged that defendant Borgess Medical Center was negligent in failing to warn others of Travis' dangerous propensities and in allowing Travis to leave the hospital and that Borgess neglected a common law or statutory duty to petition for Travis' commitment. Plaintiff subsequently amended the complaint to add an allegation that Borgess negligently failed to provide Travis with adequate evaluation and care.

On January 18, 1984, Borgess filed a motion for summary judgment pursuant to GCR 1963,

117.2(1) and (3), now MCR 2.116(C)(8) and (10). Following oral argument, Kalamazoo Circuit Court Judge Robert Borsos rendered his opinion from the bench, in which he concluded that summary judgment was merited. He found that Borgess did not have sufficient opportunity to evaluate Travis on either occasion that Travis admitted himself to the hospital and thus was not negligent in failing to render an evaluation. Judge Borsos also held that, as a nondesignated hospital under the Michigan Mental Health Code, Borgess had no duty to initiate commitment proceedings. Further, Judge Borsos found no duty on the part of the hospital to prevent Travis from leaving. With respect to the hospital's failure to warn Hinkelman, Judge Borsos concluded that Hinkelman knew more about Travis' propensities than did the hospital. He also reasoned that even if there was a duty it was terminated by the intervention of the police and the court. In addition, Judge Borsos found that there was no agency relationship between Overbey and Borgess upon which to impute Overbey's knowledge of Travis to Borgess. Finally, Judge Borsos found that § 412 of the Mental Health Code, MCL 330.1412; MSA 14.800(412), imposed no duty on Borgess to confine a patient overnight if that patient wanted to leave after normal day hours. On February 24, 1984, an order was entered in conformity with Judge Borsos' opinion.

On March 15, 1984, plaintiff filed a motion for reconsideration of the order of summary judgment. Judge Borsos reaffirmed summary judgment by order of August 30, 1984, from which plaintiff now appeals.

Plaintiff's claims against Kalamazoo College were subsequently dismissed on those parties' stipulation, and the college is not a party on appeal.

Against this factual background, plaintiff alleges

that Borgess Medical Center breached common law and statutory duties which resulted in Hinkelman's death. Plaintiff's claims are primarily founded in negligence and focus upon the hospital's failure to restrain Travis when he sought to leave the hospital and on the hospital's failure to warn Hinkelman of Travis' dangerousness. In addition, plaintiff claims that Borgess had a duty to seek Travis' involuntary commitment under the admission and discharge provisions of the Mental Health Code, MCL 330.1400 *et seq.;* MSA 14.800(400) *et seq.*

We first turn to plaintiff's allegation of the hospital's failure to warn. In the seminal case of *Tarasoff v Regents of the University of California,* 17 Cal 3d 425; 131 Cal Rptr 14; 551 P2d 334 (1976), the California Supreme Court held that a psychiatrist owes a duty to use reasonable care to protect persons endangered by his patient. *Tarasoff* was founded on the common law rule of negligence that a person owes a duty to protect individuals from third persons when there is a special relationship with either the dangerous person or the potential victim.

The *Tarasoff* reasoning was adopted by this Court in *Davis v Lhim,* 124 Mich App 291; 335 NW2d 481 (1983), remanded 422 Mich 875 (1985). In so doing, the Court emphasized that such liability is premised upon the psychiatrist's control over a dangerous patient: " 'One who takes charge of a person having known propensities for danger is under a duty to exercise reasonable care to control the third person' ". 124 Mich App 301, quoting from *Knight v Michigan,* 99 Mich App 226, 236; 297 NW2d 889 (1980). Based upon the special relationship between psychiatrist and patient, Michigan imposes a duty upon psychiatrists to protect readily identifiable persons from the dan-

gers posed by patients. *Welke v Kuzilla,* 144 Mich App 245, 250-251; 375 NW2d 403 (1985). Whether the undisputed facts in a particular case merit imposition of this duty is a question of law. *Bardoni v Kim,* 151 Mich App 169, 176; 390 NW2d 218 (1986).

Although Michigan cases previously addressing this issue involved suits against psychiatrists, the duty may also be imposed on psychiatric hospitals or other entities which undertake to render psychological treatment. See, e.g., *Vistica v Presbyterian Hospital & Medical Center of San Francisco, Inc,* 67 Cal 2d 465; 62 Cal Rptr 577; 432 P2d 193 (1967); *Chrite v United States,* 564 F Supp 341 (ED Mich, 1983). Cf., *Knight v Michigan,* 99 Mich App 226; 297 NW2d 889 (1980). The duty is premised upon a special relationship of control over the patient.

As a facility providing psychiatric treatment, defendant Borgess Medical Center has a general duty to protect third persons from its dangerous patients. However, in the instant case summary judgment was nevertheless proper.

First, plaintiff has failed to allege any facts which would establish the requisite special relationship between defendant and Daniel Travis. As was noted by the trial court, Travis was not a hospital patient for any appreciable length of time. Rather, on two occasions he voluntarily admitted himself and stayed for only a few hours. The hospital was not afforded sufficient time to begin to evaluate and treat Travis. On the facts presented, there was no special relationship established that would impose a duty on the hospital.

Plaintiff contends that defendant's special relationship with Travis was established through the agency of Dr. Overbey. Generally, a hospital is not vicariously liable for the negligence of a physician

who is an independent contractor and who merely uses the hospital's facilities to render treatment. *Grewe v Mt Clemens General Hosp,* 404 Mich 240, 250; 273 NW2d 429 (1978). However, if a patient looks to the hospital to provide treatment and there is a representation by the hospital that treatment would be afforded by physicians working there, an agency by estoppel can be found. The critical question is whether the patient looked to the hospital for treatment or merely viewed the hospital as the place where his physician would render treatment. *Grewe, supra,* pp 250-251. Here, it is undisputed that Travis' relationship with Dr. Overbey preceded Travis' admission to Borgess Medical Center. Thus, there was an independent physician-patient relationship between Travis and Overbey. This independent relationship precludes plaintiff's theory of agency by estoppel. *Wilson v Stilwill,* 411 Mich 587, 610; 309 NW2d 898 (1981).

Second, even assuming the existence of a special relationship giving rise to a general duty, plaintiff has failed to allege a cognizable breach of that duty. Although the complaint contains broad language regarding the defendant's duty to use reasonable care, plaintiff primarily urges the hospital's failure to warn and its failure to retain Travis on the hospital premises as negligent conduct.

There is no dispute here that Virginia Hinkelman was a person readily identifiable as foreseeably endangered by Travis' conduct. Indeed, Hinkelman had been attacked by Travis several times prior to the fatal incident. However, regardless of whether the hospital knew or should have known of the danger to Hinkelman, the victim herself was aware of the danger. Since Hinkelman already knew of the danger, the duty to warn did not arise. *In re Estate of Votteler,* 327 NW2d 759,

762 (Iowa, 1982). Similarly, under the circumstances the failure to warn cannot constitute a proximate cause of Hinkelman's death. *Bardoni, supra,* 151 Mich App 184 n 9.

Plaintiff also asserts that the defendant had a duty to keep Travis hospitalized, either under an unspecified common law duty or pursuant to the Mental Health Code. While Michigan courts have not yet addressed this issue, the courts of many other states have done so. Our review of our sister courts' decisions convinces us that plaintiff's argument cannot prevail.

Critical to our analysis is the fact that Travis was a voluntary patient. Mental institutions are not prisons, nor places where people are confined to oblivion. *In re Jones Estate,* 52 Mich App 628, 634; 218 NW2d 89, lv den 392 Mich 770 (1974); *Sharpe v South Carolina Dep't of Mental Health,* 281 SC 242, 245; 315 SE2d 112, 113-114 (1984). Rather, the voluntary patient carries the key to the hospital's exit in his hand. *Doe v Public Health Trust of Dade County,* 696 F2d 901, 903 (CA 11, 1983). Indeed, MCL 330.1412; MSA 14.800(412) provides that informal voluntary patients shall be allowed to terminate hospitalization.

The duty of a psychiatric treatment facility to protect third persons is premised upon the facility's special relationship to the patient. However, in order to take charge of a person in such a manner as will create a duty to control his conduct, the facility must possess the ability to control that person's conduct. *Abernathy v United States,* 773 F2d 184, 187 (CA 8, 1985). Thus, while mental hospitals charged with the control and treatment of dangerous patients have been held responsible for patient conduct, the duty has been

imposed based upon the control vested by involuntary commitment. See, e.g., *White v United States,* 250 US App DC 435; 780 F2d 97 (1986); *Cain v Rijken,* 300 Or 706; 717 P2d 140 (1986); *Santangelo v State,* 129 Misc 2d 898; 494 NYS2d 49 (Ct Cl, 1985); *Durflinger v Artiles,* 234 Kan 484; 673 P2d 86 (1983). In contrast, where a patient's hospitalization was voluntary, no duty has been imposed due to the facility's inability to compel patient confinement. See, e.g., *Abernathy v United States, supra; Furr v Spring Grove State Hosp,* 53 Md App 474; 454 A2d 414 (1983).

In the instant case, defendant Borgess Medical Center had little, if any, ability to control Travis. As a voluntary patient, Travis' hospitalization or freedom was subject to his own volition. Under the circumstances, the hospital cannot now be charged with the consequences of Travis' decision to leave.

Finally, plaintiff argues that the defendant hospital should have sought Travis' involuntary commitment pursuant to MCL 330.1423; MSA 14.800(423) or MCL 330.1434; MSA 14.800(434). Mandatory hospitalization under § 423 applies only to certain hospitals designated by the Department of Mental Health, of which defendant here is not one. Otherwise, the statutory language is permissive and allows petition for commitment by any adult. MCL 330.1434(1); MSA 14.800(434)(1). There is nothing in these provisions which requires the hospital here to act. Further, there is no common law duty on the part of the hospital, given the absence of any special relationship between it and Travis. There is no basis here upon which to impose liability.

Accordingly, the circuit court's order of summary judgment is affirmed.