James SELLERS, conservator of the estate of Terrance Sellers, an incompetent person, Plaintiff–Appellant,

and

Frank J. Kelley, Attorney General of the State of Michigan and the Michigan Department of Social Services, Plaintiffs–Intervenors,

v.

UNITED STATES of America, Defendant–Appellee.

No. 88–1179.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 31, 1989.

Decided March 24, 1989.

Gary C. Newton (argued), Sloan, Benefiel, Farrer, Newton & Glista, Kalamazoo, Mich., for James Sellers.

Janis Meija, Asst. Atty. Gen., Stephen H. Garrard, Asst. Atty. Gen., Lansing, Mich., for Frank J. Kelley, Attorney General of the State of Mich., Michigan Dept. of Social Services.

---

Anne Vandermale Tuuk, Asst. U.S. Atty., Janice Kittelmann (argued), Asst. U.S. Atty., Grand Rapids, Mich., for U.S.

Before KRUPANSKY and BOGGS, Circuit Judges, and EDWARDS, Senior Circuit Judge.

PER CURIAM.

Sellers appeals the decision of the district court finding that, as a matter of law, the government owed no duty to Sellers's ward for the conduct of Allen Firestine, who was treated for manic depression at the Veteran's Administration Hospital (VAH) in Battle Creek, Michigan. Sellers's ward, Terrance Sellers, was severely beaten by Firestine on February 17, 1985. Firestine had been an inpatient and was still receiving outpatient treatment at the time of the incident. Sellers filed suit against the VAH under the Federal Tort Claims Acts (FTCA), 28 U.S.C. § 2671 *et seq.*, for negligent discharge of Firestine from the VAH, negligent outpatient treatment, and negligent failure to warn the public of Firestine's potentially violent behavior. We affirm the district court's decision on the grounds that a psychiatrist has no duty to warn the general public in such situations, but has only a relatively narrow duty to warn readily identifiable potential victims.

I

Sellers filed an administrative claim on August 16, 1985. On February 21, 1986, the claim was denied, at which time a complaint was filed in district court. The complaint alleged that the VAH was negligent in discharging Firestine and that, during the outpatient phase of treatment, the VAH was negligent in its medication and treatment regimen, as well as in failing to recognize that Firestine was again becoming manic.

On June 2, 1986, the government moved for summary judgment, which motion focused on the issues of duty and proximate cause. In addition, the government moved for dismissal of the allegations regarding improper treatment and medication because they had not been raised at the administrative level. The district court held that the administrative claim was sufficient as a prerequisite to the claims filed in the district court, but that the government owed no duty to Sellers's ward arising from the outpatient treatment. Thus, summary judgment for the government was entered on January 13, 1988.

Firestine was voluntarily admitted to the VAH on October 1, 1984, stating "I cannot handle myself without proper medications, I have mood swings and I need help." In further conversations, he stated that he could become very angry. The discharge summary shows that Firestine was described as hyperactive and labile (unstable). He was diagnosed as having a bipolar disorder, commonly known as manic depression, and was initially placed on Thorazine. This was replaced with Haldol for a short time; however, because of side-effects, he was later switched back to Thorazine. He was then started on lithium carbonate. Lithium carbonate is typically used in cases involving bipolar disorder, or manic depression, often during maintenance phases of treatment. While in the VAH, Firestine exhibited aggressive or assaultive behavior a number of times. Notes in his files indicate that he was variously hyperactive, threatening (including having threatened a student nurse with harm and, ultimately, death), demanding of attention and extremely aggressive. While an inpatient, he was involved in an altercation with another veteran in which nobody was hurt. He was discharged on December 19, 1984 and was to continue to receive outpatient treatment. He was prescribed lithium carbonate.

Sellers alleges that the dosage of lithium was too small during the outpatient stage of treatment. Indeed, tests showed that Firestine's lithium blood level dropped from 1.00 mEq (milli-equivalent) while an inpatient to 0.67 mEq during his first outpatient visit after having been released. At that time, his prescribed dosage was decreased twenty percent. He was seen again about a month later, on February 13, 1985, at which time his blood lithium level was 0.52 mEq. At the time of that visit, he was cheerful and complained of poor sleep, both symptoms of relapse. Dr. Nagler,

Sellers's expert, stated that "[f]alling lithium levels and sleep disturbances are sirens that should alert one to potential difficulties in patients with bipolar disorders and require further blood tests and immediate followup and monitoring."

Early on February 17, 1985, Firestine confronted Terrance Sellers and beat him over the head with a baseball bat. A witness to the beating, Frank Wagner, testified that Sellers was not armed nor was he angry or intruding. The altercation took place in a motor home of Sellers's former girlfriend, Colleen Savage, who had become Firestine's girlfriend and is now his wife. Savage testified that Sellers had arrived intoxicated and armed with "nun-chucks" to confront Firestine. The investigating police officer saw no evidence that the door had been struck by nun-chucks, as Firestine claims it had. Kenneth Dubois, the taxi-driver who drove Sellers to Savage's home, stated that Sellers was not belligerent when he got out of the cab.

Dr. Nagler stated that the therapeutic blood lithium level is 0.6 to 0.8 mEq, as did Dr. Abad, who treated Firestine as an inpatient. However, Dr. Abad later changed his testimony, stating that 0.5 is the proper level. Dr. Brophy, the government's expert, testified that the maintenance level is 0.4 to 1.0. However, on cross-examination, Brophy admitted that the man who he regards as the "top authority in the world," Dr. Schou, states that the standard level is 0.6 to 0.8. Dr. Halaris, another expert, stated that "a lithium plasma level below 0.7 milliquivalents per liter is not generally associated with clinical efficacy." The Physician's Desk Reference states that "desirable serum lithium levels are 0.6 to 1.2." Dr. Inumerable testified that a psychiatrist would worry about a person with bipolar disorder becoming violent if he had a relapse.

It is undisputed that Firestine never mentioned Terrance Sellers to any of the personnel at the VAH, nor did he voice any threats towards Sellers prior to the incidents. In fact, there is nothing in the record to indicate that Firestine knew Sellers at all until after his release.

The trial judge granted summary judgment, finding that the government had no duty towards Sellers. First, the court noted that, in Michigan, the rule is that duty hinges on foreseeability, which itself hinges on whether the victim was readily identifiable as a likely target of a patient's aggression. Thus, because Firestine had never mentioned Sellers to anybody at the VAH, Sellers was not readily identifiable, and thus any incident with Sellers could not have been foreseen. In fact, with respect to the claim that Firestine was negligently released from the VAH, the judge noted that Firestine did not even know Sellers at that time. With respect to the claims of negligence in post-release monitoring, the judge found that Sellers was no more readily identifiable after Firestine's release than before it, and that a psychiatrist owes no general duty to the public at large, unlike a physician, who may have a more expansive duty of care in some circumstances. The court explained that this difference in the scope of the duties of physicians and psychiatrists is based on the greater indefiniteness, and thus decreased foreseeability, with regard to psychological, as opposed to physical, illness. Thus, the judge concluded that the VAH owed Sellers no duty of care regarding the post-release monitoring of Firestine.

## II

On appeal, Sellers argues that the VAH *did* owe a duty to Sellers's ward as a member of the public. He argues that it was entirely foreseeable that Firestine would exhibit aggressive behavior, and that he might act violently. In addition, because of decreased lithium blood levels and increased symptoms associated with manic depression, Sellers argues that the VAH knew or should have known that Firestine was in need of greater doses of medication, and that he was heading towards a relapse. The government argues that the psychiatrist's duty is only to readily identifiable persons, and that Sellers was in no sense readily identifiable.

The standard of review of a summary judgment is that a summary judgment

should be sustained if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

The law to be applied in cases brought under the FTCA is "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Thus, because all of the acts and omissions alleged here occurred in Michigan, the law of the state of Michigan applies.

However, intermediate state court decisions are not controlling "where the highest court of the State has not spoken on the point." *Commissioner of Internal Revenue v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967) (citations omitted). If there has been no decision by the state's highest court on an issue, "federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State." *Ibid.* In that the Michigan Supreme Court has not ruled on the issue of a psychiatrist's duty to the general public, we stand in the shoes of the Michigan Supreme Court in an attempt to determine how it would decide this case.

The trial judge reasoned that Sellers's administrative claim was sufficient to put the agency on notice of his claims, and that this was sufficient to satisfy the exhaustion requirements of the FTCA. 28 U.S.C. § 2675(a). This court has stated that "the requirements of § 2675 are met 'if the claimant (1) gives the agency written notice of his or her claim sufficient to enable the agency to investigate and (2) places a value on his or her claims.'" *Douglas v. United States,* 658 F.2d 445, 447 (6th Cir.1981) (quoting *Adams v. United States,* 615 F.2d 284, 289 (5th Cir.1980), *as clarified,* 622 F.2d 197 (5th Cir.1980). *Accord Broudy v. United States,* 722 F.2d 566, 569 (9th Cir.1983); *Shipek v. United States,* 752 F.2d 1352, 1354 (9th Cir.1985). Thus, because the administrative claim in this case meets the above test, the exhaustion requirement has been met.

## III

We now turn to the more substantive, and more difficult, issues in this case. Although the Michigan Supreme Court has passed on the issue of whether the immunity of a state government employee extends to psychiatrists, *Canon v. Thumudo,* 430 Mich. 326, 422 N.W.2d 688, 698–701 (1988), because the court decided that issue in the affirmative, it has not had to reach the issue of a psychiatrist's duty on release and post-release treatment. However, in deciding the immunity issue, the court did have to determine whether a psychiatrist's role in release decisions and post-release treatment were "decisional" (and immunity attaches) or ministerial (and immunity does not attach) in nature. *Ibid.* Thus, although the court's decision regarding immunity dealt with *state* claims against *state* officials, and so does not apply in the context of a FTCA claim, some of the court's dicta may be instructive.

*Canon* involved consolidated appeals in three cases, the most applicable being *Davis v. Lihm,* 124 Mich.App. 291, 335 N.W.2d 481 (1983), *remanded on other grounds,* 422 Mich. 875, 366 N.W.2d 7 (1983), *on remand,* 147 Mich.App. 8, 382 N.W.2d 195 (1985), *rev'd sub nom Canon,* 430 Mich. 326, 422 N.W.2d 688 (1987). The appeals in *Davis* all dealt with the immunity issue. However, in its original opinion, the Court of Appeals discussed the issues involved in the case now before us in detail. The court noted, first, that this issue has been addressed by a number of other jurisdictions which have found that, in certain circumstances, a psychiatrist may owe a duty to "use reasonable care to protect third persons from the harmful acts of his patients." *Davis,* 335 N.W.2d at 486 (citing *Leedy v. Hartnett,* 510 F.Supp. 1125 (M.D.Pa.1981), *aff'd,* 676 F.2d 686 (3rd Cir. 1982); *Lipari v. Sears, Roebuck & Co.,* 497 F.Supp. 185 (D.Neb.1980); *McIntosh v. Milano,* 168 N.J.Super. 466, 403 A.2d 500 (1979); *Department of Health and Rehabilitative Services v. McDougall,* 359 So.2d 528 (Fla.App.1978); *Tarasoff v. Regents of the University of California,* 17 Cal.3d

425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976)). The leading case is *Tarasoff*, which the Michigan court discussed in detail.

In *Tarasoff*, in which a psychiatric outpatient killed a woman whose parents sued the patient's psychiatrist for failure to protect her, the California Supreme Court stated that no duty is owed unless there is a special relationship with either the dangerous person or the victim. 17 Cal.3d at 435, 131 Cal.Rptr. at 22–23, 551 P.2d at 342–43. The Court found that the relationship between psychiatrist and patient is such a relationship. However, the Court further determined that the duty extends only to events which are reasonably foreseeable, holding that a danger to a third person is foreseeable when the doctor "determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another...." *Id.* at 431, 131 Cal.Rptr. at 20, 551 P.2d at 340.

The Michigan courts have followed *Tarasoff*, holding that "a psychiatrist owes a duty of reasonable care to a person who is foreseeably endangered by his patient." *Davis*, 335 N.W.2d at 487. However, this duty is a limited one because of the inexact nature of the science of psychiatry, and the burden a more expansive duty might impose on psychiatrists. *Id.* at 487–88. Not only is the duty limited to the standard of care of the profession, but the class of persons to whom a duty is owed is limited "to only those persons readily identifiable as foreseeably endangered." *Ibid.*

The California Supreme Court, subsequent to its decision in *Tarasoff*, explained the policy considerations requiring that the duty be so limited. *Thompson v. County of Alameda*, 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728 (1980). The court explained how damaging it could be to the therapeutic relationship if a patient were inhibited from voicing threats, and how complacent the public might get were every threat made in the presence of a psychiatrist reported. *Id.* at 752, 167 Cal.Rptr. at 76, 614 P.2d at 734. The Michigan court found this rationale to be persuasive, and so announced the following rule:

[W]hen a psychiatrist determines or, pursuant to the standard of care of his profession, should determine that his patient poses a *serious danger of violence to a readily identifiable person*, the psychiatrist has as a duty to use reasonable care to protect that individual against such danger.

*Davis*, 335 N.W.2d at 489 (emphasis added). The Michigan Supreme Court reversed the judgment against the psychiatrist in *Davis* because it found that he was protected by immunity. *Canon*, 422 N.W.2d at 700. However, the court did not undermine or challenge the lower court's statement of the general rule as to when a duty attaches; in fact, statements such as "the decision whether to warn a third party ... requires highly professional judgment ...," and "reaching such a determination ... requires ... professional evaluation ...," *ibid.*, imply the court's acceptance of the rule announced in *Davis*. The rule in *Davis* has been employed consistently by the Michigan Courts of Appeals. *Welke v. Kuzilla*, 144 Mich.App. 245, 375 N.W.2d 403, 405 (1985); *Jackson v. New Center Community Mental Health Services*, 158 Mich.App. 25, 404 N.W.2d 688, 693 (1987); *Bardoni v. Kim*, 151 Mich.App. 169, 390 N.W.2d 218, 221 (1986); *Hinkelman v. Borgess Medical Center*, 157 Mich.App. 314, 403 N.W.2d 547, 550 (1987). However, this rule is not unanimous among all jurisdictions. *Lipari*, 497 F.Supp. 185 (D.Neb. 1980).

■ Although this question of whether a duty exists is a question of law, and so is appropriate for resolution on a motion for summary judgment, *Welke*, 375 N.W.2d at 405, the question of whether a third person was "readily identifiable" "requires review of the evidence." *Davis*, 335 N.W.2d at 489. In the instant case, Firestine had never mentioned Sellers to anyone at the VAH. In fact, as the trial judge noted, Firestine did not even know Sellers at the time of his release. As regards the claim of post-release negligence, although medical testimony regarding appropriate blood lithium levels and Firestine's state of mind indicate that, in the opinion of the experts, the VAH should have been concerned, Sell-

ers *never* became a readily identifiable potential target of Firestine's violent tendencies. In *Davis,* the court noted that there was general expert testimony as there was in this case; however, that testimony was not enough to resolve the question of whether injury to the particular victim was foreseeable, and so the court focused on the question of whether the victim was readily identifiable prior to the incident. *Id.* at 490. Here, the evidence is undisputed that the VAH had no reason to know that Sellers was in any danger from Firestine.

There have been exceptions to the "readily identifiable" rule in Michigan in the case of physicians. In *Welke,* in which the defendant driver hit and killed the plaintiff's deceased, the court stated that a doctor who had injected a patient-driver with an "unknown substance" had a special relationship with the patient; unlike in the instant case, "the doctor's malpractice is the proximate cause of a plaintiff's injuries and ... the doctor himself is in the best position to prevent the harm." *Id.* at 406. This is vastly different from the instant case in that, there, the doctor alone knew what he was injecting and its side-effects, including whether it could impair driving ability; the likelihood that an injury would occur was foreseeable to the doctor and only the doctor. In the present case, it is clear that nobody at the VAH was in the best position—or any position—to have foreseen the specific harm. Sellers went to the home of his former girlfriend, found Firestine there, and subsequent events regarding the reason and mode of initiation of the struggle between the two men can only be conjectured.[1]

In *Duvall v. Goldin,* 139 Mich.App. 342, 362 N.W.2d 275 (1984), the court again found that a duty existed even though the ultimate victim was not "readily identifiable." There, the court held that the existence of a special relationship with the "dangerous" person, but not with the victim, was enough on which to base the existence of a duty. *Id.* at 278. However, in discuss-

ing the foreseeability element, the court explicitly distinguished "cases involving a psychiatrist's duty to warn a third party of the dangerous propensities of his patient," from those "involving the physician's duty of care to third parties arising out of the diagnosis of disease or the prescription of medication which may impact or alter the patient's behavior and in turn endanger third parties." *Id.* at 278–79. This distinction would differentiate the instant case from *Duvall,* in which a doctor had not warned an epileptic patient of the potential danger of driving a car, as well as cases like *Welke,* in which the doctor administered an unknown drug.

We agree with the Michigan Court of Appeals regarding the validity of the distinction between a physician's duty and a psychiatrist's duty to the public at large. The science of psychiatry is relatively inexact as compared with the physical sciences. The behavior of psychiatric patients, and their reactions to psychoactive drugs, is much more difficult to predict, and thus to foresee, than the behavior and reactions of patients who are treated for purely physical conditions. Thus, we find cases like *Duvall* and *Welke,* involving the duty of physicians, to be distinguishable.

This case is more like *Jackson v. New Center Community Mental Health Services,* 158 Mich.App. 25, 404 N.W.2d 688, 693 (1987), in which a psychiatric patient went on a "random shooting spree." The court found that, because the victims were not readily identifiable, their representatives' claims of negligence in treatment and supervision could not be maintained, thus granting summary judgment. *Id.* at 693. In *Bardoni v. Kim,* 151 Mich.App. 169, 390 N.W.2d 218 (1986), the patient was a paranoid schizophrenic, which illness may produce violent behavior. Upon his release from a mental institution, the patient killed his mother and brother. The court held that the duty of the doctor to have warned the patient's family members that the patient was dangerous was entirely depend-

---

1. As there is significant factual disagreement regarding the cause of the brawl between the two men, and even who initiated it, the issue of the causation of the brawl could not be decided on a motion for summary judgment. Fed.R. Civ.P. 56(c).

ent on whether the family members were readily identifiable. *Id.* at 224. The court concluded that the patient's brother was readily identifiable because evidence indicated that the doctor should have known of threats made against the brother. *Id.* at 225. However, because the patient had never voiced any threats towards his mother, she was not a readily identifiable victim. *Ibid.*

In *Bardoni,* the court distinguished *Duvall,* stating that there is a distinction between cases such as *Duvall* in which negligent treatment is alleged, and those "involving a psychiatrist's duty to a third party where the third party is endangered by the patient's violent or assaultive conduct stemming from the patient's underlying psychological problems." *Id.* at 222. This case would fall into the latter category and thus, as in *Bardoni* and *Davis,* no duty exists because Sellers was not a readily identifiable victim.

Therefore, we hold that the VAH was not negligent in failing to warn the general public, including Sellers, of Firestine's possible behavior; nor was the VAH negligent in Firestine's outpatient treatment as it may have affected Sellers. Negligence cannot be found absent a duty to the complaining party. *Bardoni,* 390 N.W.2d at 222. Thus, we affirm the decision of the district court on these two issues.

### IV

The claim of negligent discharge of a patient requires a slightly different analysis, although the above discussion regarding an absence of a duty towards Sellers applies here as well. However, there are additional reasons why Sellers cannot succeed on his claim of negligent discharge.

Firestine was admitted to the VAH voluntarily. A review of the case law will demonstrate that this fact is central to a determination of the VAH's duty regarding the length of Firestine's commitment. An analysis of this issue centers on the question of whether a "special relationship" exists between the patient and the hospital.

In *Hinkelman v. Borgess Medical Center,* 157 Mich.App. 314, 403 N.W.2d 547

(1987), the court specifically addressed the issue of when a special relationship should be found to exist. The court explained that the existence of a special relationship, such as that between a physician and patient, is premised on the notion of control over the patient. *Id.* at 550. In *Hinkelman,* the court found that there was no special relationship between the patient and the hospital when the patient had been admitted voluntarily, had not stayed more than a few days, and had left before he could be treated. *Id.* at 551. The court placed great weight on the fact that the duty imposed on mental hospitals is "based on the control vested by *involuntary* commitment." *Id.* at 552 (emphasis added). "In contrast, where a patient's hospitalization was voluntary, no duty has been imposed due to the facility's inability to compel patient confinement." *Ibid.* The court distinguished between the duty of a physician to his patient and third parties, and the duty of a hospital, as here, to a patient who is voluntarily committed, as was Firestine.

In *Soutear v. United States,* 646 F.Supp. 524 (E.D.Mich.1986), a VA hospital was sued for failing to try to commit involuntarily a patient who later killed his parents. The court stated that, although in hindsight it was clear that commitment and medication would have been appropriate, the VA doctors had not fallen below the standard of their profession by failing to commit him involuntarily. *Id.* at 536. The court was very adamant about the rule that "'a psychiatrist will not be held liable for his patient's violent behavior simply because he failed to predict it accurately.'" *Ibid.* (quoting *Davis,* 335 N.W.2d at 487–88). Thus, the court concluded that the VA doctors could not be held liable under Michigan law for failing to commit and treat a patient whose violence, and the subject of that violence, were not easily predictable.

■ In the present case, in that Firestine was a voluntary patient at the VAH, the case law is clear that the hospital did not have a "special relationship" which would support a duty on the part of the VAH to have forced him to remain confined. *Hink-*

*elman,* 403 N.W.2d at 552. Thus, not only did the hospital owe no duty to Sellers because he was not readily identifiable, but his voluntary status meant that the VAH did not have a "special relationship" with Firestine on which to base a duty to keep him confined.

### V

Although it is easy in hindsight to point to the falling blood lithium levels and cheerfulness as signs of an oncoming relapse, it is clear that Sellers was not a readily identifiable victim, nor was Firestine symptomatic enough to have excited the fears of the VA doctors. Thus, although we sympathize with the plight of victims such as Sellers, we cannot place the blame on the VAH and its doctors. Therefore, the district court's judgment is AFFIRMED.

