STRACH v ST JOHN HOSPITAL CORPORATION

Docket No. 84052. Submitted May 12, 1986, at Detroit. Decided May
    18, 1987. Leave to appeal applied for.

    Edward G. Strach and Delphine Strach brought a medical mal-
        practice action in the Wayne Circuit Court against St. John
        Hospital Corporation, Leandro F. Africa, M.D., and Jose I. Yap,
        M.D., seeking damages for injuries sustained by Edward Strach
        as a result of surgery performed on him at the defendant
        hospital. The case against Dr. Yap was dismissed without
        prejudice prior to trial. After the jury trial began, the case
        against Dr. Africa was dismissed with prejudice. The jury
        returned a verdict against the hospital, awarding Mr. Strach
        $1,200,000 and Mrs. Strach $600,000. The trial court, Louis F.
        Simmons, Jr., J., issued an order in accordance therewith.
        Defendant hospital appeals from that order and from an order
        denying the hospital's motions for new trial, judgment notwith-
        standing the verdict or remittitur, alleging several errors.

        The Court of Appeals *held:*

        1. The Court of Appeals expressed its disapproval of the
        proposition that an independent relationship between the pa-
        tient and his treating physician requires a finding of no ostensi-
        ble agency relationship as a matter of law in regard to the

REFERENCES

Am Jur 2d, Agency § 13.

Am Jur 2d, Appeal and Error §§ 836, 891.

Am Jur 2d, Evidence §§ 251-253, 260, 262, 1080 *et seq.*

Am Jur 2d, Physicians and Surgeons §§ 158, 160.

Am Jur 2d, Trial §§ 574, 651.

Am Jur 2d, Witnesses § 422.

What constitutes physician-patient relationship for malpractice
    purposes. 17 ALR4th 132.

Excessiveness or adequacy of damages awarded for injuries to back,
    neck, or spine. 15 ALR4th 294.

Identity of witnesses whom adverse party plans to call to testify at
    civil trial, as subject of pretrial discovery. 19 ALR3d 1114.

Malpractice in diagnosis and treatment of diseases or conditions of
    the heart or vascular system. 19 ALR3d 825.

See also the annotations in the Index to Annotations under Instruc-
    tions to Jury; Witnesses.

hospital where treatment was rendered. Acts or omissions of a hospital in the particular circumstances of treatment may override the impressions created by a previous relationship and reasonably create a belief that a staff physician is acting on behalf of the hospital. The critical factor is whether the patient reasonably looked to the hospital for treatment or merely viewed it as a situs for treatment by his physician.

2. The facts indicate that Mr. Strach could reasonably have looked to the hospital itself, in addition to Dr. Africa and Dr. Yap, for treatment. There was ample testimony upon which the jury could conclude that the plaintiffs looked to the defendant hospital itself for treatment.

3. The evidence shows conduct by the defendant hospital tending to create an ostensible agency. Dr. Yap's actions and those of the hospital's personnel indicate that the doctor was *not viewed as an independent contractor but, rather, he had* authority over hospital personnel. The hospital's acquiescence in the use of the vernacular "St. John Hospital team" and in the direct exercise of authority over its employees by Dr. Yap is conduct of a principal tending to create ostensible agency.

4. Nothing in the record would compel a finding by the jury that the plaintiffs had actual notice of Dr. Yap's status as an independent contractor.

5. Reasonable persons could conclude that an ostensible agency existed between Dr. Yap, the St. John Hospital cardiac team and St. John Hospital. The trial court did not err in denying the hospital's motions for directed verdict or judgment notwithstanding the verdict with respect to the issue of ostensible agency. No error was committed in submitting the matter to the jury.

6. The trial court did not abuse its discretion in allowing Dr. Arnold Rosenbaum, M.D., to testify as an expert on the issue of malpractice.

7. The trial court did not abuse its discretion in admitting the testimony of Dr. Africa under the adverse party statute and in excluding any mention of a settlement reached with Dr. Africa subsequent to his testimony.

8. There is no evidentiary basis for the hospital's argument that an erroneous evidentiary ruling precluded the jury from being properly informed of Dr. Yap's participation in the suit as a defendant.

9. The trial court did not abuse its discretion in allowing the admission into evidence of a videotape of Mr. Strach after finding the videotape to be more probative than prejudicial. The videotape was properly received into evidence after au-

thentication and relevance were established and it was not inadmissible hearsay.

10. The trial court did not abuse its discretion by allowing the expert testimony of two witnesses for plaintiffs who had never been identified or disclosed during discovery or in any of the plaintiffs' witness lists prior to commencement of trial.

11. No basis for reversal is presented in the jury instructions given by the trial court.

12. The jury's award was within the range of the evidence produced at trial and does not shock the judicial conscience of the Court of Appeals.

Affirmed.

P. C. ELLIOTT, J., dissented. It is his belief that the evidence of ostensible agency was insufficient. He would hold that, to be held liable for the malpractice of a surgeon not actually employed by it, a hospital should be shown to have misled the patient who relied upon appearances, created by the hospital, that the negligent surgeon worked for it, as its employee, and would be subject to its control. He would hold that such a showing cannot be made in this case. It is his belief that the trial court also erroneously instructed the jury. He would reverse.

1. AGENCY — PHYSICIANS AND SURGEONS — OSTENSIBLE AGENCIES — HOSPITALS.

A finding of an independent physician-patient relationship between a patient and his treating physician does not require as a matter of law a finding of no ostensible agency relationship between a hospital where the patient is treated and the treating physician; the critical factor is whether the patient reasonably looked to the hospital for treatment or merely treated it as a situs for treatment by his physician.

2. PARTIES — CROSS-EXAMINATION — ADVERSE PARTIES — SETTLEMENTS.

An opposite party may not be called as an adverse party for purposes of cross-examination under the adverse party statute where there has been a settlement with that party (MCL 600.2161; MSA 27A.2161).

3. EVIDENCE — RELEVANCY.

A trial court has broad discretion in ruling on the relevancy of evidence submitted at trial and the Court of Appeals will not reverse the trial court's decision absent an abuse of discretion.

4. EVIDENCE — RELEVANT EVIDENCE — RULES OF EVIDENCE.

All relevant evidence is admissible except as otherwise provided

by either the federal or state constitution or the Rules of Evidence; relevant evidence may be excluded if its probative value is substantially outweighed by the risk of unfair prejudice, confusion of issues, waste of time or misleading the jury (MRE 401, 402 and 403).

5. APPEAL — WITNESSES — FAILURE TO LIST WITNESSES — WAYNE CIRCUIT COURT — COURT RULES.

The proper standard of review of a Wayne Circuit Court decision that there was good cause shown for a party's failure to list witnesses prior to trial is an abuse of discretion standard (GCR 1963, 301.10).

6. APPEAL — JURY INSTRUCTIONS — PRESERVING QUESTION — COURT RULES.

Allegations of instructional errors to which specific objections were not made pursuant to the applicable court rule are reviewed on appeal only where a complaining party has suffered manifest injustice (MCR 2.516[C]).

7. TRIAL — JURY INSTRUCTIONS.

A party has the right to have the jury accurately instructed on the applicable law; it is error to submit to a jury an instruction on an issue which is not sustained by the evidence.

8. APPEAL — JURY — VERDICT.

A new trial may be granted when excessive damages appearing to have been influenced by passion or prejudice are awarded by a jury; a reviewing court may substitute its judgment for that of the jury only where the verdict has been secured by improper methods, prejudice or sympathy, or where it is so excessive as to shock the judicial conscience; the Court of Appeals will not reverse a verdict as excessive where it is within the range of evidence produced at trial.

*Lopatin, Miller, Freedman, Bluestone, Erlich, Rosen & Bartnick* (by *Monica Farris Linkner*), for plaintiffs.

*Kitch, Saurbier, Drutchas, Wagner & Kenney, P.C.* (by *Susan Healy Zitterman* and *Mona K. Majzoub*), for St. John Hospital Corporation.

Before: Hood, P.J., and Wahls and P. C. Elliott,* JJ.

Per Curiam. Defendant St. John Hospital Corporation appeals as of right from a jury verdict in this medical malpractice action. We affirm.

This lawsuit arose out of surgery performed on plaintiff Edward Strach at St. John Hospital by defendants Jose I. Yap, M.D., and Leandro F. Africa, M.D., to repair a posttraumatic aortic aneurysm. Plaintiff Delphine Strach's claim is for loss of consortium. Prior to trial, the case against Dr. Yap was dismissed without prejudice. After the jury trial began, the case against Dr. Africa was dismissed with prejudice. The jury returned a verdict against St. John Hospital (hereafter defendant), awarding Edward Strach (hereafter plaintiff) $1,200,000 and his wife, Delphine Strach, $600,000. Defendant moved for a new trial, judgment notwithstanding the verdict or remittitur and those motions were denied.

I

On January 5, 1980, plaintiff Edward Strach was injured in an automobile accident when another vehicle crossed the center line and struck him head-on. Plaintiff was subsequently admitted to River District Hospital for treatment of a ruptured diaphragm. He was discharged one week later in apparent good health. However, as he was walking out of the hospital, he was stopped by Dr. Go, his attending physician.

Dr. Go told the plaintiff that he should take his x-rays and see Dr. Africa within a week. Dr. Go explained that there might be a bruise on plaintiff's aorta, the main artery leading from the

* Circuit judge, sitting on the Court of Appeals by assignment.

heart. Plaintiff felt fine at the time, but complied with Dr. Go's recommendation. An appointment was scheduled with Dr. Africa for January 22, 1980.

In January of 1980, Dr. Africa was working in private practice as a general surgeon. Dr. Africa was not board certified, but had staff privileges at St. John Hospital, St. Joseph Hospital and Saratoga General Hospital. When plaintiff arrived at Dr. Africa's office on January 22, 1980, he brought the x-rays from River District Hospital as requested. This was the first time plaintiff met Dr. Africa.

After Dr. Africa reviewed the x-rays, he advised plaintiff that he could either wait six weeks and have a repeat chest x-ray or go to St. Joseph Hospital the following day for an aortagram. Plaintiff elected the latter.

On January 23, 1980, Dr. Africa admitted plaintiff to St. Joseph Hospital where the aortagram was performed. Immediately following the aortagram, Dr. Africa diagnosed a traumatic aneurysm of the aorta. He advised plaintiff and his wife separately of the diagnosis and recommended immediate surgery. At this point, the testimony is conflicting.

Dr. Africa testified that he told the Straches that he was unable to perform the surgery at St. Joseph Hospital. He therefore recommended that plaintiff be transferred to St. John Hospital, where care was available. Although Dr. Africa did not recall the exact conversation, he testified that he usually gave his patients a choice of three hospitals which have cardiac "teams": (1) Harper Hospital; (2) Henry Ford Hospital; and (3) St. John Hospital.

Mr. Strach testified variously: that Dr. Africa told him only that he must go immediately to St.

John Hospital for surgery; that Dr. Africa might have given him the names of several hospitals where the surgery could have been performed; that he (Mr. Strach) preferred St. John Hospital because he had heard good things about it; that he was primarily relying upon his wife to make the decisions as to treatment; and that his memory of the events surrounding his hospitalization was blurred by the trauma associated with it.

Mrs. Strach testified that she encountered Dr. Africa in the hallway of St. Joseph Hospital after he had spoken with her husband. According to Mrs. Strach, the decision to admit her husband to St. John had already been made and an ambulance had been ordered. However, Mrs. Strach also testified that she would not have allowed her husband to be transferred to St. John if she had heard of any bad things occurring there. Mrs. Strach further testified that she was acquainted with a friend's brother who was a very fine physician and worked at St. John Hospital. Finally, Mrs. Strach testified that Dr. Africa told her that there was a doctor or a team of doctors at St. John Hospital who could perform the necessary surgery.

Plaintiff arrived by ambulance at St. John Hospital on the afternoon of January 23, 1980. Dr. Yap met Mr. Strach there and introduced himself. Dr. Yap explained that Dr. Africa had contacted him by phone and asked him to admit plaintiff. Some time thereafter, Mrs. Strach arrived at St. John Hospital. Dr. Yap met Mrs. Strach in either the waiting area of the emergency room or a separate office where he spread her husband's x-rays out on a desk. He pointed to an area of the x-rays and said "that has to be removed or your husband is going to die." Dr. Yap also told Mrs. Strach that her husband might die upon the operating table, but the surgery had to be done right

away. A few hours later, while Mr. Strach was still in the emergency room, Dr. Africa arrived and wrote the admitting note.

Surgery was performed two days later, on January 25, 1980. The chief surgeon was Dr. Yap. Assisting Dr. Yap, as a member of the operative team, was Dr. Grady, a specialist in general and vascular surgery, Dr. Alvarez, a fellow in vascular surgery, and Dr. Stoyha, an anesthesiologist. Those physicians were members of the St. John Hospital team for open heart surgery. They were selected by Dr. Yap for participation in plaintiff's surgery. Dr. Africa, in his own words, "assisted the St. John team."

In the course of surgery, three methods were attempted for the repair of plaintiff's aorta. First there was an attempt to use an intraluminal graft —a tubular device from four to eight centimeters long, from twenty to thirty-four millimeters in diameter and made of synthetic material with steel rings at the ends. This method, which was no more than two years old at the time of plaintiff's surgery, required insertion of the graft into the aorta. Plaintiff's expert, Dr. Rosenbaum, testified that the use of intraluminal grafts was on a protocol investigational basis. It proved unsuccessful in plaintiff's case because the only graft available during plaintiff's surgery proved too large to fit into plaintiff's aorta.

The second method attempted during plaintiff's surgery was a direct repair or primary auostomosis—cutting away the damaged portion of the aorta and sewing the aorta back together. This method also proved unsuccessful when the shortened aorta put too much tension on the sutures. There was additionally some possibility that friable, or damaged, tissue which was left in place caused the sutures to tear.

Finally, an interpositional graft, also of synthetic material, was applied to the exterior of the aorta. This method strengthened the sutured incision, but required the sacrifice of a number of intercostal blood vessels—vessels branching out from the aorta. The intercostal vessels provide oxygenated blood to various portions of the body, including the spinal column. The precise number of intercoastal vessels sacrificed was a matter of dispute. Whether any of the intercostal vessels sacrificed fed the spinal column was also a matter of dispute. However, the use of the interpositional graft was successful in the sense that the aorta itself was repaired and the surgeons could proceed with closing the chest cavity.

The surgery, which began with anesthesia at 1:00 P.M., was completed at 8:10 P.M. Afterwards, Dr. Africa informed Mrs. Strach that surgery was over and her husband was fine. The next morning, Dr. Africa came to see Mrs. Strach and informed her that her husband was suffering from a temporary paralysis below the waist. Dr. Africa requested Mrs. Strach's permission for a consultation with a neurosurgeon.

After the neurosurgeon examined Mr. Strach, Mrs. Strach was informed that her husband's paralysis was permanent. Other examining neurosurgeons requested by Mrs. Strach confirmed the permanence of her husband's paralysis.

Mr. Strach remained at St. John Hospital for approximately two weeks. He was then transferred to the rehabilitation department of South Macomb Hospital. Upon his arrival at South Macomb Hospital, it was discovered that Mr. Strach was suffering from a severe bed sore and urinary tract infection. Mr. Strach suffered continued paralysis and related ailments through the time of trial.

Both plaintiffs suffered mental problems, including depression, subsequent to the surgery.

II

On appeal, defendant St. John Hospital first argues that the trial court erred in denying its motions for a directed verdict or judgment notwithstanding the verdict with respect to the issue of ostensible agency. The standard for this Court in reviewing a defendant's motion for directed verdict is whether, viewing the facts in a light most favorable to the plaintiff, reasonable persons could reach a different conclusion. If so, the case should be submitted to the jury. *In re Sarras Estate,* 148 Mich App 171, 175; 384 NW2d 119 (1986). The same standard of review applies to a motion for a judgment notwithstanding the verdict. *Id.*

It is undisputed that plaintiffs' claims against St. John Hospital rest upon a theory of ostensible agency or agency by estoppel. Plaintiffs do not assert that the defendant physicians were in fact employees or agents of the defendant hospital nor do they assert that any torts were committed by other persons who were in fact employees or agents of the defendant hospital. As our Supreme Court has explained:

> Generally speaking, a hospital is not vicariously liable for the negligence of a physician who is an independent contractor and merely uses the hospital's facilities to render treatment to his patients. See Anno: *Hospital-Liability-Neglect of Doctor,* 69 ALR2d 305, 315-316. However, if the individual looked to the hospital to provide him with medical treatment and there has been a representation by the hospital that medical treatment would be afforded by physicians working therein, an agency

by estoppel can be found. See *Howard v Park,* 37 Mich App 496; 195 NW2d 39 (1972), lv den 387 Mich 782 (1972). See also *Schagrin v Wilmington Medical Center, Inc,* 304 A2d 61 (Del Super Ct, 1973).

In our view, the critical question is whether the plaintiff, at the time of his admission to the hospital, was looking to the hospital for treatment of his physical ailments or merely viewed the hospital as the situs where his physician would treat him for his problems. A relevant factor in this determination involves resolution of the question of whether the hospital provided the plaintiff with Dr. Katzowitz or whether the plaintiff and Dr. Katzowitz had a patient-physician relationship independent of the hospital setting. [*Grewe v Mt Clemens General Hospital,* 404 Mich 240, 250-251; 273 NW2d 429 (1978).]

The *Grewe* Court quoted at length from *Stanhope v Los Angeles College of Chiropractic,* 54 Cal App 2d 141; 128 P2d 705 (1942), for the proposition that an institution may be held liable under a theory of ostensible agency for the malpractice of its independent contractors. *Stanhope,* citing in turn *Hill v Citizens National Trust & Savings Bank,* 9 Cal 2d 172, 176; 69 P2d 853, 855 (1937), adopted a three-part standard for establishing the creation of an ostensible agency: (1) the person dealing with the agent must do so with belief in the agent's authority and this belief must be a reasonable one; (2) the belief must be generated by some act or neglect on the part of the principal sought to be charged; and (3) the person relying on the agent's authority must not be guilty of negligence. However, the *Grewe* Court's subsequent analysis of the ostensible agency issue on the facts before it does not follow the *Hill* formula. *Grewe* instead resolves the ostensible agency issue primarily on the basis of to whom the plaintiff looked

for treatment when he entered the hospital. *Grewe, supra* at 253-255. Whether the defendant physician was referred by the hospital was an "important" factor in the Court's decision, but its importance was clearly subordinate to the question of to whom Grewe looked for treatment when he entered the hospital.

We acknowledge that the matter of physician referral may also be relevant to whether the plaintiff's belief in the physician's agency is generated by the hospital itself. However, the *Grewe* Court had previously noted that the very structure of the modern hospital as an institution gives rise to numerous manifestations of an agency relationship with staff members.

> "The conception that the hospital does not undertake to treat the patient, does not undertake to act through its doctors and nurses, but undertakes instead simply to procure them to act upon their own responsibility, no longer reflects the fact. Present-day hospitals, as their manner of operation plainly demonstrates, do far more than furnish facilities for treatment. They regularly employ on a salary basis a large staff of physicians, nurses and interns, as well as administrative and manual workers, and they charge patients for medical care and treatment, collecting for such services, if necessary, by legal action. Certainly, the person who avails himself of 'hospital facilities' expects that the hospital will attempt to cure him, not that its nurses or other employees will act on their own responsibility." [*Grewe, supra* at 251, quoting with approval *Bing v Thunig,* 2 NY2d 656; 143 NE2d 3 (1957).]

This is not to say that the actions of the defendant hospital are irrelevant to the question of whether an ostensible agency has been created. However, it seems highly unlikely that any single

act or omission on the part of a modern hospital or its alleged agents would render it impervious to proof of an ostensible relationship with staff members. In this context, we express our disapproval of the often-suggested proposition that an independent relationship between the patient and his treating physician *requires* a finding of no agency relationship as a matter of law. It seems apparent that acts or omissions of a defendant hospital in the particular circumstances of treatment may override the impressions created by a previous relationship and reasonably create a belief that a staff physician is acting on behalf of the hospital. We find no reliable contrary authority.

*Wilson v Stilwill*, 411 Mich 587, 610; 309 NW2d 898 (1981), is most often cited for the proposition that an independent physician-patient relationship necessarily precludes a finding of vicarious liability on the part of a defendant hospital. However, the passing reference to an independent relationship in *Wilson* was left undeveloped and unexplained by the Court. Instead, the *Wilson* Court held that there was in fact no tortious conduct on the part of the defendant physician alleged to be the ostensible agent of the hospital. Obviously, where there is no underlying tort, there can be no vicarious liability—whether or not an agency relationship is established. *Lamb v Oakwood Hospital Corp*, 41 Mich App 287, 290; 200 NW2d 88 (1972).[1] Given the lack of reasoning associated with its reference to an independent patient-physician relationship and the well-established, alternative ground for its holding, we find *Wilson* to be, at

[1] In *Hinkelman v Borgess Medical Center,* 157 Mich App 314 403 NW2d 547 (1987), a panel of this Court also held that the existence of an independent patient-physician relationship precluded vicarious liability on the part of the defendant hospital, but further held that there was no evidence of medical malpractice on the part of the alleged ostensible agent and physician.

best, dubious authority for the proposition that finding an independent physician-patient relationship necessarily precludes finding an ostensible agency between a hospital and its staff physicians.

*Heins v Synkonis,* 58 Mich App 119; 227 NW2d 247 (1975), cited by the defendant hospital herein, involved an allegation of malpractice by a plaintiff who first encountered the defendant physician in the latter's outpatient practice at the defendant hospital. Since no independent relationship existed between the patient and physician, the facts of *Heins* are remarkably similar to those of *Grewe.* This Court nevertheless found no ostensible agency as a matter of law, noting that the only evidence of an agency relationship was the fact that all meetings and treatment between the physician and plaintiff were at the defendant hospital. We can only reconcile *Heins* with *Grewe* by noting that *Heins* preceded *Grewe* by some three years. In any case, since there was no independent patient-physician relationship in *Heins,* it provides no support for the legal proposition at issue.

*Revitzer v Trenton Medical Center, Inc,* 118 Mich App 169; 324 NW2d 561 (1982), lv den 417 Mich 995 (1983), and *Howard v Park,* 37 Mich App 496; 195 NW2d 39 (1972), lv den 387 Mich 782 (1972), also cited by defendant on the ostensible agency question, involved relatively small clinics which were alleged to be vicariously liable for the malpractice of their staff physicians. *Howard,* in which a finding of ostensible agency was actually upheld, referred to a number of factors relevant to ostensible agency, including the lack of an independent patient physician relationship. *Revitzer,* citing the numerous factors employed by *Howard,* upheld summary judgment for the defendant clinic. *Revitzer* perhaps comes closest to elevating the factor of an independent relationship to an

absolute bar.[2] However, it is by no means clear that the *Revitzer* panel did so. In any case, as noted *supra,* neither *Howard* nor *Revitzer* involved the modern hospital whose institutional persona was so aptly described in *Grewe.*

At this point in the development of Michigan's jurisprudence we think that it would be wise to return momentarily to the Restatement Agency, 2d, which provides simply:

> [A]pparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him. [1 Restatement Agency, 2d, § 27, p 103.]

The Restatement Agency, 2d, rule closely parallels the *Hill* rule quoted in *Grewe,* although the *Hill* rule was developed in the context of commercial transactions and therefore places greater emphasis on the possible negligence of the third party.[3] The salient point remains, however, that neither rule would necessarily preclude a finding of an agency relationship because of an independent pre-exist-

[2] We acknowledge one additional opinion of this Court in which the aforementioned principle was cited. *Heins v Detroit Osteopathic Hospital Corp,* 150 Mich App 641; 389 NW2d 141 (1986). However, the few facts of *Heins'* admission and treatment provided in that opinion do not contradict the Court's conclusion that the hospital was nothing more than the site where the treating physician provided care.

[3] This is indicated by the fact that the *Hill* standard requires both that the belief of the third party be reasonable, under part one, and that the third party must not be guilty of negligence, under part three. Our review of *Hill* indicates that part one emphasizes the representations or misrepresentations of the principle sought to be charged while part three emphasizes the investigation or lack thereof conducted by the third party. An emphasis on the latter seems to us to be more appropriate in the context of a commercial transaction than in the context of medical care. See also: 1 Restatement Agency, 2d, § 27, Comment d (distinguishing the principle of apparent authority or ostensible agency from agency by estoppel).

ing patient-physician relationship. As stated in *Grewe*, the *critical* factor is whether the plaintiff reasonably looked to the hospital for treatment or merely viewed it as a situs for treatment by his physician. The facts at bar present an excellent example of why the mere existence of an independent physician-patient relationship should not necessarily preclude a finding that the patient reasonably looked to the hospital itself for treatment.

The Straches themselves did not have a family physician at the time of Edward Strach's car accident; their previous family physician had retired some years before. Thus, Dr. Go, who initially treated Mr. Strach at River District Hospital, was referred to Mr. Strach by the hospital itself. The only evidence of record indicates that the patient-physician relationship between Edward Strach and Dr. Go was limited to one week of hospitalization at River District Hospital.

Upon discharge from River District Hospital, Edward Strach was referred to defendant Dr. Africa for consultation. Like Dr. Go, Dr. Africa had no prior relationship with Edward Strach. However, Edward Strach sought Dr. Africa's advice in the doctor's capacity as a private practitioner. It can only be inferred that there was an independent patient-physician relationship between Dr. Africa and Edward Strach prior to the St. John Hospital admission.

Nevertheless, the independent relationship between Dr. Africa and Edward Strach consisted of only two meetings in the span of two days. Dr. Africa reviewed the x-rays brought by Mr. Strach to his January 22, 1980, appointment. The following day, January 23, 1980, Dr. Africa apparently assisted in Mr. Strach's aortagram.

In our view, the critical events in the creation of ostensible agency followed the aortogram. At that

time, Dr. Africa told Mr. Strach that he had an aneurysm on his aorta, requiring immediate surgery. Under cross-examination, Dr. Africa testified as follows:

*Q.* [*Plaintiffs' Counsel*] Dr. Africa, yesterday we were discussing some conversations you had with the Strach's. I think you indicated you thought the conversations were individually, but basically they were the same?

*A.* [*Dr. Africa*] Same content yes, sir.

*Q.* And I think you indicated yesterday that you didn't really have a specific recall of the conversations, but you know what you generally tell patients in that setting; is that correct?

*A.* That is right, sir.

*Q.* And we went through that, you offered—you generally offer three hospitals, St. John's, Harper and Henry Ford Hospital, correct?

*A.* Yes.

*Q.* And am I correct, Doctor, that you feel that the kind of surgery that you were contemplating for the patient, is best done by a team approach?

*A.* That is how I approach this type of problem.

*Q.* And is that what you generally tell the patients, that it should be approached by a team?

*A.* When it comes to—when it comes to even a thoracic aorta.

*Q.* That is what we are dealing with here?

*A.* Yes, sir.

*Q.* That is what you would generally tell the patient?

*A.* Yes, sir, all my patients.

*Q.* You would generally tell them that it can be a team from Henry Ford Hospital, a team from Harper Hospital, or a team from St. John's Hospital?

*A.* I tell them that Henry Ford Hospital has the facility, Harper Hospital has the facility, St. John Hospital has the facility.

*Q.* And has the team, the people that make up this team that you think is required?

*A.* Yes, sir.

The jury was entitled to give credence to Dr. Africa's testimony of his routine practice in these circumstances. MRE 406. Elsewhere in the record, Dr. Africa testified: that he himself was "on the staff" of St. John Hospital; that the "St. John team" performed the surgery; that Dr. Yap made all the arrangements for the St. John team; and that he, Dr. Africa, merely assisted staff members of St. John Hospital who comprised the cardiac team. We believe that Edward Strach, hearing such statements, could reasonably have looked to the hospital itself, in addition to Dr. Africa and Dr. Yap, for treatment.

Our conclusion is unchanged upon review of the Straches' testimony. Although the weight of his testimony is reduced by inconsistencies and his poor memory, Edward Strach did testify that he preferred St. John Hospital for treatment because he had heard good things about it. Delphine Strach, whose memory was apparently more acute, testified that she was relieved upon being told that her husband was being transferred to St. John Hospital for care:

> *Q. [Plaintiffs' Counsel]* What, if you can remember, other than obviously being concerned for your husband, and frightened, when Dr. Africa had this conversation with you, do you remember what your thoughts were?
>
> *A. [Delphine Strach]* My thoughts, I know exactly my thoughts. A friend of mine's brother is a physician at St. John's Hospital, and I, he's a very fine physician, so that made me feel a little more comfortable. I had friends that had gone to St. John's Hospital, and I had never heard any bad things about it, so, I wasn't alarmed about St. John's Hospital.
>
> *Q.* If it was a hospital that you had heard of and

bad things had occurred there, or you didn't even know of, even if the hospital had already been contacted and the ambulance was on the way, would you have allowed Ed to go there?

*A.* Not if I had heard bad things. I think that would have stopped me right there.

We also find it significant that neither Delphine nor Edward Strach recalled being told the name of a specific surgeon who would treat them at St. John Hospital.

Although it is apparent that there was ample testimony upon which the jury could conclude that the Straches looked to St. John Hospital itself for treatment, the defendant hospital argues that there was no specific conduct on its part which caused the Straches to do so. The record indicates otherwise. The testimony of Dr. Africa, who was himself a staff member of St. John Hospital, shows repeated lapses into referring to the operating physicians as "the St. John team." By permitting, or perhaps even encouraging, the use of this vernacular by its staff, St. John Hospital encouraged patients to look to it for treatment.

That appearance was reinforced by other actions of the defendant hospital at the time of Mr. Strach's admission. Even according to Dr. Yap's testimony, he was notified of Mr. Strach's arrival at St. John by nurses in the admitting area. There he met Mr. Strach for the first time, escorting him from the confusion of the admitting area to an office. In the admitting office, a nurse took down information for Mr. Strach's emergency room chart while Dr. Yap reviewed Mr. Strach's x-rays. Dr. Yap subsequently ordered that Mr. Strach be placed in a quiet room or holding area away from the admitting area. These actions were taken long before Dr. Africa arrived at the defendant hospital. Indeed, the record is unclear as to whether Dr.

Africa even saw Mr. Strach between the time of his admission and the beginning of surgery.

The actions taken by Dr. Yap in conjunction with hospital personnel are not those of an independent contractor, but those of one who is an integral part of the St. John Hospital "team." The actions taken upon Mr. Strach's admission evidence not only Dr. Yap's familiarity with hospital personnel, but also his authority over them. That the defendant hospital acquiesced in the use of the vernacular "St. John Hospital team" and in the direct exercise of authority over its employees is conduct of the principal tending to create ostensible agency. See *Shinabarger v Phillips,* 370 Mich 135; 121 NW2d 693 (1963) (acquiescence by the principal in an agent's exercise and display of authority is sufficient to establish ostensible agency).

Finally, the defendant hospital argues that the plaintiffs had actual notice of Dr. Yap's status as an independent contractor, thereby removing any cloud of ostensible agency. However, we find nothing in the record which would compel such a finding on the part of the jury. Although the defendant hospital asserts that the plaintiffs had notice through their agent, Dr. Africa, there was no evidence of record which would require a finding that Dr. Africa was cognizant of Dr. Yap's independent-contractor status. Again we note Dr. Africa's repeated lapses into "the St. John team" vernacular in the course of his testimony. Furthermore, there was no testimony of record indicating that Dr. Africa was aware of the details of Dr. Yap's financial or organizational relationship with St. John Hospital.

St. John Hospital also argues that actual notice was directly provided by Dr. Yap to the Straches in the admission meeting. Dr. Yap did testify that

he informed the Straches at that meeting that he was an independent contractor doing surgery at St. John Hospital. We would not go so far as to say that Dr. Yap's testimony was inherently incredible, but neither would we conclude that the jury was bound to accept it merely because neither of the Straches could recall it. See *Baldwin v Nall,* 323 Mich 25, 29; 34 NW2d 539 (1948) (a jury may disbelieve the most positive evidence even when it stands uncontradicted, and the judge cannot take from them their right of judgment).

After reviewing all of the defendant hospital's arguments in this regard, the facts of record and applicable law, we conclude that reasonable persons could conclude that an ostensible agency existed between Dr. Yap, the St. John Hospital cardiac team and St. John Hospital. No error was committed by the trial court in submitting the matter to the jury. *In re Sarras Estate, supra.*

III

Defendant argues that error requiring reversal occurred in allowing Dr. Arnold Rosenbaum, M.D., a board certified general surgeon, to testify as an expert on the issue of malpractice by Drs. Yap and Africa, specialists in thoracic surgery. We disagree.

As Dr. Rosenbaum explained, thoracic surgery is surgery in the area of the thorax. The thorax is an area inside of the rib cage, including the intrathoracic esophagus, lungs, heart and the upper portion of the aorta. Other portions of the body, including the lower aorta, lie within the province of general surgery. Dr. Rosenbaum testified as follows:

*Q.* [*Plaintiffs' Counsel*] Doctor, you have reviewed the records in this case; is that correct?

*A.* Yes.

*Q.* Do you feel you are familiar with the standard of practice for surgeons who are going to attempt the kind of repair done in this case?

*A.* Yes.

*Q.* And why do you feel that you are familiar with that standard of practice. Can you give us a summary of that?

*A.* I have seen patients both before and after these surgeries. I have a visited [sic] on these surgeries during my residency, and more recently this past year, and the traumatic aneurysm surgery is the same particularly when it's in the abdomen or in the chest. The only difference I have obviously is whether one opens the chest or the abdomen. As far as the vessels which were involved, there are vessels in the abdomen which have to be reimplanted just as there are vessels in the chest which require implantation. Most of the problems encountered are identical.

*Q.* Doctor, the aorta. Is the makeup, the lining, the inside, the outside, any different in the chest than it is in the abdomen?

*A.* No.

Dr. Rosenbaum's testimony in this regard is supported by his experience as a resident in which he assisted in about forty repairs of the thoracic aorta.

The Michigan Rules of Evidence provide:

> If the court determines that recognized scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. [MRE 702.]

As we have previously held:

> In Michigan, the test for determining whether a

witness is qualified as an expert witness in a medical malpractice action is whether the witness is familiar with the appropriate standard of care. *Swanek v Hutzel Hospital,* 115 Mich App 254, 257; 320 NW2d 234 (1982); *Francisco v Parchment Medical Clinic, PC,* 407 Mich 325, 327; 285 NW2d 39 (1979). The witness must possess the necessary learning, knowledge and skill, or practical experience that would enable him or her to competently testify about that area of medicine. *Siirila v Barrios,* 398 Mich 576, 591; 248 NW2d 171 (1976); *Swanek, supra.* This Court will not reverse a trial court's ruling on the qualifications of an expert witness absent an abuse of discretion. *Wood v Posthuma,* 108 Mich App 226, 230; 310 NW2d 341 (1981); *Swanek, supra.* [*Pietrzyk v Detroit,* 123 Mich App 244, 246-247; 333 NW2d 236 (1983), lv den 417 Mich 1100.5 (1983). See also, *Spalding v Spalding,* 355 Mich 382; 94 NW2d 810 (1959) (defining "abuse of discretion").]

Here, although plaintiffs' expert is certified in another speciality, both areas involve surgery of essentially the same type at issue. Dr. Rosenbaum provided credible testimony that he is familiar with the applicable standard of care. We therefore find no abuse of discretion in the trial court's qualification of Dr. Rosenbaum as an expert.

IV

Defendant argues that the trial court erred by admitting the testimony of Dr. Africa under the adverse party statute and by shielding from the jury the circumstances of the settlement with Dr. Africa along with the fact of Dr. Yap's active participation in the lawsuit as a defendant.

Prior to commencement of trial, the case against Dr. Yap was dismissed without consideration or prejudice. The trial court later informed the jury that Dr. Yap had been, but was no longer, a

defendant. Before jury selection, plaintiffs' counsel informed the court that plaintiffs were inclined to enter into a settlement with Dr. Africa, accepting his insurance policy limits after he testified. Counsel requested an advisory opinion as to whether the court would permit Dr. Africa to be called for cross-examination under the adverse party statute given these circumstances. The court stated it would not. Apparently, as a result, the settlement discussions terminated.

At the time of Dr. Africa's testimony, plaintiffs' counsel, Dr. Africa's attorney and Dr. Africa each stated that there was no settlement. Therefore, the trial court allowed Dr. Africa to be called as an adverse witness. Immediately after Dr. Africa's testimony, he offered his policy limits to settle the case, and plaintiffs accepted this offer.

Defendant contends that the settlement proposed with Dr. Africa was actually consummated before trial while formal acceptance was postponed until Dr. Africa completed his testimony. That postponement, according to defendant, allowed plaintiffs the benefit of calling Dr. Africa under the adverse party statute when Dr. Africa was not truly an adverse party.

The adverse party statute, MCL 600.2161; MSA 27A.2161, provides:

> In any suit or proceeding in any court in this state, either party, if he shall call as a witness in his behalf, the opposite party . . . shall have the right to cross-examine such witness the same as if he were called by the opposite party; and the answers of such witness shall not interfere with the right of such party to introduce evidence upon any issue involved in such suit or proceeding, and the party so calling and examining such witness shall not be bound to accept such answers as true.

However, where there has been a settlement between a party and the opposite party, the opposite party may not be called as an adverse party for purposes of cross-examination under MCL 600.2161; MSA 27A.2161. *Wilson v W A Foote Memorial Hospital,* 91 Mich App 90, 100; 284 NW2d 126 (1979). The trial court has the authority to control the order and admission of evidence, and its rulings must not be disturbed absent an abuse of discretion. *Serafin v Peoples Community Hospital Authority,* 67 Mich App 560, 566; 242 NW2d 438 (1976), lv den 397 Mich 880 (1976).

Here the trial court concluded that there was no settlement prior to Dr. Africa's testimony. The trial court not only heard the testimony concerning the absence of a settlement agreement, but also observed the witnesses, counsel and parties. We find no abuse of discretion in the trial court's ruling and therefore decline to reverse. *Serafin, supra.*

Defendant further argues that once the settlement was reached with Dr. Africa, the jury should have been apprised of the circumstances. MRE 408 provides:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. . . . This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

As noted *supra,* Dr. Africa had not settled with plaintiff at the time of his testimony. Therefore, he cannot be considered biased due to the settlement at the time he testified for purposes of MRE 408. Any mention of the settlement was properly excluded.

Finally, defendant argues that an erroneous evidentiary ruling precluded the jury from being properly informed of Dr. Yap's participation in the suit as a defendant. In cross-examination, plaintiffs' counsel questioned Dr. Yap as to whether he was trying to protect Dr. Africa or St. John Hospital. Defense counsel objected to the line of questioning and her objection was sustained. Later, in redirect, defense counsel sought to question Dr. Yap as to whether he had ever been a defendant in the case. At that point, plaintiffs' counsel objected, citing MRE 408. Defendant argued then, as it does on appeal, that it was entitled to a full disclosure of Dr. Yap's involvement in the case because plaintiffs' counsel had opened the door to this line of questioning in cross-examination. We disagree.

First, we note that plaintiffs' counsel did not ask Dr. Yap whether he had ever been a party to the case, but merely whether he was trying to protect the defendants. Thus, it cannot be said that plaintiffs' counsel opened a line of questioning as to whether Dr. Yap had ever been a defendant. Furthermore, even if plaintiffs' counsel's question is construed as an attempt to open the door to that line of questioning, a timely objection by defense counsel precluded the question from being answered. We conclude that there is no evidentiary basis for defendant's argument.

V

Defendant argues that the "day-in-the-life of"

videotape of plaintiff should have been excluded under MRE 403 as it was both unfairly prejudicial and a needless presentation of cumulative evidence. Additionally, it contends that, pursuant to MRE 801 and 802, the videotape was inadmissible hearsay and that failure to exclude it was prejudicial error. We disagree.

As noted in *Bartlett v Sinai Hospital of Detroit,* 149 Mich App 412, 416-417; 385 NW2d 801 (1986):

> MRE 401 defines relevant evidence as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. All relevant evidence is admissible except as otherwise provided by either the federal or state constitution or the rules of evidence. MRE 402. Relevant evidence may be excluded if its probative value is substantially outweighed by the risk of unfair prejudice, confusion of issues, waste of time or misleading the jury. MRE 403.

A trial court has broad discretion in ruling on the relevancy of evidence submitted at trial and this Court will not reverse the trial court's decision absent an abuse of discretion. *Kirk v Ford Motor Co,* 147 Mich App 337, 343-344; 383 NW2d 193 (1985).

Here the videotape accurately shows the mobility problems associated with plaintiff's injury, including his difficulty in getting out of bed, grooming and getting out of the house. It also shows the modifications made on plaintiffs' house to accommodate plaintiff's disability. Thus, the videotape provides probative evidence of the damages suffered by plaintiff. Moreover, since neither Mr. nor Mrs. Strach are expert witnesses, we believe that

the tape provides much better evidence than their testimony alone.

On the other hand, certain aspects of the videotape were unfairly prejudicial. In this regard, we note the use of portions of the tape which showed Mr. Strach watching a football game and those showing a crucifix over the plaintiffs' bed. However, our own review of the tape leads us to the conclusion that, on the whole, it was more probative than prejudicial. We find no abuse of discretion in the same conclusion on the part of the trial court. *Kirk, supra.*

We also find no merit in defendant's contention that the videotape is inadmissible hearsay. MRE 801 provides both the definition of "hearsay" and the definition of "statement." " 'Hearsay' is a statement . . . offered in evidence to prove the truth of the matter asserted." MRE 801(c). A statement is "a nonverbal conduct of a person, if it is intended by him as an assertion." MRE 801(a)(2). Here, the videotape was offered to illustrate the testimony of plaintiff regarding his daily activities after the alleged malpractice. It was not offered to be an assertion, nor to prove the truth of any matter asserted. Thus, it was correctly treated the same as a photograph. *People v Heading,* 39 Mich App 126, 132; 197 NW2d 325 (1972), lv den 389 Mich 782 (1973). The tape was properly received into evidence after authentication and relevance were established. *Id.*

VI

Defendant argues that the trial court abused its discretion by allowing the expert testimony of two witnesses for plaintiffs who had never been identified or disclosed during discovery or in any of the plaintiffs' witness lists prior to commencement of trial.

GCR 1963, 301.10, applicable in Wayne County only, provides:

> Notice of pretrial conference shall be forwarded by the court to all counsel of record at least 6 weeks prior to the date of such conference. Within 10 days after receipt of such notice, counsel shall exchange lists of all witnesses to be called at the trial. *No witness may be called at the trial of the case unless listed in such exchange of witnesses, except by leave granted upon a showing of good cause.*

Pursuant to that rule, the circuit court was required to find that there was good cause for the plaintiffs' failure to list witnesses. *Pollum v Borman's, Inc,* 149 Mich App 57; 385 NW2d 724 (1986). Whether to allow a witness to testify is a matter of discretion for the circuit court. Thus, the proper standard of appellate review of such a circuit court decision is an "abuse of discretion" standard. *Id.*

In the present case, plaintiffs did not specifically mention two subsequent treating physicians until one week prior to jury selection, nor did they inform defendant's counsel that they would be calling them as witnesses until the first day of trial. Plaintiffs' failure to bring defendant's attention to the witnesses sooner is highly questionable. However, neither of the witnesses based any of their opinions upon a controversial point and their testimony for the most part concerned treatment they had rendered to plaintiffs. We therefore conclude that there was no abuse of discretion on the part of the trial court. See, *Rittenhouse v Erhart,* 126 Mich App 674; 337 NW2d 626 (1983), aff'd in part 424 Mich 166; 380 NW2d 440 (1985). Cf., *Pollum, supra* (opposing party had inadequate

time to prepare a response to testimony based upon a highly controversial procedure).

## VII

Defendant St. John Hospital next alleges four instructional errors on the part of the trial court. Defendant first argues that the trial court erred by instructing the jury that it could hold the defendant hospital liable for the conduct of "Dr. Yap and for the surgical team" upon finding an ostensible agency relationship. The thrust of defendant's argument is that the instruction would allow a verdict to be rendered against St. John Hospital based upon the negligence of members of the operating team other than Dr. Yap. St. John Hospital further notes that there was no evidence of the standard of care or breach thereof by Drs. Grady or Alvarez, vascular surgeons, or Dr. Stoyha, the anesthesiologist. The defendant therefore concludes that the instruction was not based upon any evidence of record and therefore must be reversed.

The phrasing to which the defendant refers was the subject of discussion on the record prior to the jury charge. The matter was resolved as follows:

> *Mr. Rosen: [Plaintiffs' Counsel]* Am I correct, also, wherever we have fill-ins in the standard jury instruction we're now going to, when it's Dr. Yap, we'll put Dr. Yap and the surgical team, is that—
> *Ms. Majzoub: [Defense Counsel]* I object to that phrasing.
> *Mr. Rosen:* Based upon your prior motion.
> *Ms. Majzoub:* Based upon my reasons that I think it's prejudicial. I don't think it's a fair, I don't think it's a fair statement.
> *Mr. Rosen:* I think the simplest way to do it is Dr. Yap and the surgical team rather than name everybody in the surgical team.

*The Court:* You can't name the team, for one thing.

*Mr. Rosen:* Other then the people that were put out in the proofs I cannot, only those people.

*The Court:* That's—

*Ms. Majzoub:* Your Honor, could it read, Dr. Yap and his surgical team, could we have that language that—

*Mr. Rosen:* That's one of the issues in the case, Your Honor. If you say, and the surgical team, it doesn't say whose team it is. If it's his, St. Johns or the Straches. Then, my position would be then, Your Honor, then can we put Dr. Yap and the other members of the St. John's team. I mean, that's asking for the same thing. On the other side of the fence.

*The Court:* It will be Dr. Yap and/or other members of the vascular surgical team, or the vascular surgical team, whatever, okay? Rather than St. John's or his.

*Mr. Rosen:* Okay.

There was no direct response from defense counsel and the parties proceeded to other matters. No continuing objection was entered following the reading of the instructions. Nowhere in the record is the specific objection now brought on appeal.

The Michigan Court Rules provide:

> A party may assign as error the giving of or the failure to give an instruction only if the party objects on the record before the jury retires to consider the verdict (or, in the case of instructions given after deliberations have begun, before the jury resumes deliberations), stating specifically the matter to which the party objects and the grounds for the objection. [MCR 2.516(C).]

Absent such specific objections, allegations of instructional errors are reviewed on appeal only where a complaining party has suffered manifest

injustice. *Cornforth v Borman's, Inc,* 148 Mich App 469, 477; 385 NW2d 645 (1986), and cases cited therein.

Our review of the record shows no indication of manifest injustice. The testimony of plaintiffs' expert, Dr. Arnold Rosenbaum, provided ample evidence of malpractice on the part of Drs. Yap and Africa, including the use of an unproven method, the intraluminal graft, poor operating technique resulting in the failure of the second method, auostomosis, and a grossly overextended clamp time before completion of the third method, the interpositional graft. Moreover, the actions of Drs. Grady, Alvarez and Stoyha were never at issue in the proceedings. Thus, we find no basis for reversal in this instruction. Cf., *Cornforth, supra* (erroneous instruction went to the primary issue in the case). See also, *Rodgers v Canfield,* 272 Mich 562; 262 NW 409 (1935) (each surgeon, operating jointly, is answerable as a joint tortfeasor for his own conduct as well as that of the other which he observed or, in the exercise of reasonable diligence, should have observed).

Defendant next argues that the trial court erred by refusing to instruct the jury that plaintiffs were not claiming actual agency, but only ostensible agency. We disagree. A party has the right to have the jury accurately instructed on the applicable law. *Bowen v Nelson Credit Centers, Inc,* 137 Mich App 76, 84; 357 NW2d 811 (1984), lv den 422 Mich 877 (1985). It is error to submit to a jury an instruction on an issue which is not sustained by the evidence. *Body Rustproofing, Inc v Michigan Bell Telephone Co,* 149 Mich App 385, 390; 385 NW2d 797 (1986). Here, not only was there no evidence of actual agency or agency in fact, but it was never pled. We believe, as did the trial court,

that any reference to actual agency could only serve to mislead the jury.

Next, defendant argues that the trial court erred by instructing the jury that it could find negligence based upon a violation of the standard of care applicable to a "cardiac surgeon or cardiac team." Defendant argues that the applicable standard of care was that of a thoracic surgeon, general surgeon or anesthesiologist. However, defendant interposed no such objection at the time of trial. We may therefore review this issue only upon a finding of manifest injustice. *Cornforth, supra.* In view of testimony that the individual defendants comprised the St. John Hospital cardiac team and in view of the fact that the malpractice was allegedly caused by only one team, we do not believe that the jury was misled. Again, we find no manifest injustice upon which reversal might be predicated.

Finally, defendant argues that the trial court erroneously refused to instruct the jury that it must base its determination as to the standard of care on the expert testimony of the physicians of record. It is true that the trial court failed to give a standard of practice testimony instruction. However, our review of the record indicates that defense counsel withdrew her request for the instruction before the trial court. Thus, the following colloquy developed in the course of arguments on the instructions:

> *Mr. Rosen: [Plaintiffs' Counsel]* Standard of practice testimony required.
> Your Honor, if we didn't have standard of practice testimony, we wouldn't be going to the jury.
> *Ms. Majzoub: [Defense Counsel]* We'll strike that, Your Honor.
> *The Court:* Withdrawn.

*Ms. Majzoub:* Yes.
*The Court:* Okay.

We note that the trial court did instruct the jury that it must base its finding as to the standard of care on the evidence of record. We know of no evidence suggesting the standard of care other than that presented by the defendant physicians or plaintiffs' expert. Nor does defendant apprise us of any such evidence. We therefore conclude that the trial court's instruction accurately instructed the jury on the applicable law. *Bowen, supra.* No basis for reversal is presented in the jury instructions.

## VIII

Following the jury's verdict, defendant moved for a new trial or remittitur. This motion was denied. Defendant appeals arguing that the jury award of $1.8 million dollars is such as could not have been rationally and dispassionately reached and is so grossly excessive as to warrant a new trial. We disagree.

A new trial may be granted when excessive damages appearing to have been influenced by passion or prejudice are awarded. MCR 2.611(A)(1)(c).

As noted in *Harvey v Security Services, Inc,* 148 Mich App 260, 270; 384 NW2d 414 (1986):

> A reviewing court will substitute its judgment for that of the jury only where the verdict has been secured by improper methods, prejudice or sympathy, or where it is so excessive as to "shock the judicial conscience". *Gillispie v Bd of Tenant Affairs of the Detroit Housing Comm,* 122 Mich App 699, 704; 332 NW2d 474 (1983), lv den 417 Mich 1100.37 (1983). Where a verdict is within the

range of evidence produced at trial, this Court will not reverse it as excessive. *Kovacs v Chesapeake & O R Co,* 134 Mich App 514, 542; 351 NW2d 581 (1984).

We have reviewed plaintiff's life expectancy, employment and activities prior to surgery, along with plaintiff's life after surgery including expenses and health.

Based on the above considerations, the jury's award was within the range of the evidence produced at trial and does not shock our conscience.

Affirmed.

P. C. ELLIOTT, J. *(dissenting).* When you cut through all of the facts stated in Part I of the majority opinion and the discussion of case law in Part II, it boils down to imposing liability on the hospital without a finding of fault by the hospital if

(a) the patient is referred to his surgeon, an independent contractor, on the hospital staff;

(b) nurses and employees of the hospital take orders from independent doctors who are on the hospital staff;

(c) surgery is performed by a team of independent doctors, chosen by the chief surgeon, who are sometimes referred to as that hospital's surgical team; and

(d) a paralyzed patient who has settled with his doctors and seeks more money from the hospital says he looked to the hospital itself for treatment.

I cannot agree.

Mr. Strach was referred to Dr. Yap for surgery by his own doctor, Dr. Africa. The surgery was to be done at St. John Hospital where Dr. Yap and Dr. Africa have staff privileges. Dr. Yap, the chief surgeon, was assisted by Dr. Africa and two other

surgeons and by an anesthesiologist. All were
selected by Dr. Yap, and all, like him, were in
private practice. None of them, except Dr. Yap
and possibly Dr. Africa, were in any way to blame
for plaintiffs' injuries and none of the nurses or
others who were actually employed by the hospital
did anything wrong. A failure to inform Mr.
Strach of the risks involved or malpractice during
the surgery, if any, was committed only by Dr.
Yap and, perhaps, Dr. Africa. Since Dr. Africa was
clearly not even an ostensible agent of the hospi-
tal, any liability of the hospital rested entirely
upon a claim that Dr. Yap was an ostensible agent
of St. John Hospital, a theory approved in *Grewe v
Mt Clemens General Hospital,* 404 Mich 240; 273
NW2d 429 (1978).

Mr. Strach testified that Dr. Africa told him
only that he must go immediately to St. John
Hospital for surgery. His wife said the decision to
admit her husband had already been made and an
ambulance had been ordered when she talked to
Dr. Africa. Dr. Africa arranged to have the sur-
gery done by his friend, Dr. Yap, who said that he
informed the Straches that he was an independent
contractor. I think the evidence of ostensible
agency was insufficient and that St. John Hospital
should not be required to pay to the Straches
$1,600,000 (the amount awarded by the jury less
credit the trial court allowed for monies received
from Dr. Africa) plus interest.

Plaintiffs' lawyer sought to establish the "deep-
pockets" doctrine of ostensible agency by referring
to Dr. Yap and the doctors who assisted him as
"St. John's surgical team." Open heart surgery, or
other delicate operations, will always be done by a
team of doctors in a hospital with an appropriate
staff, operating room and equipment. Such surgery
is not done on a table by a "Hawkeye" assisted

only by a nurse "Hotlips." The chief surgeon is in
charge and must be the captain of the team in sole
control of the life and death decisions being made.
To be held liable for the malpractice of a surgeon
not actually employed by it, a hospital should be
shown to have misled the patient who relied upon
appearances, created by the hospital, that the
negligent surgeon worked for it, as its employee,
and would be subject to its control. There was no
evidence in this case that St. John Hospital did
anything to create an appearance that it employed
Dr. Yap; and the hospital did nothing, except for
having a good reputation, that was relied upon by
Mr. Strach. It would be unreasonable for him to
believe that the hospital would control how the
surgery would be performed and that it would be
responsible for a surgeon's malpractice if some-
thing happened to go wrong during the operation.

In addition to the lack of sufficient evidence for
a finding of ostensible agency the trial judge's
instructions were erroneous. SJI2d 30.01, defining
"professional negligence" or "malpractice," SJI2d
30.02, concerning "informed consent," and SJI2d
15.01, defining "proximate cause," should not have
had their blanks filled in with "Dr. Yap and/or
the surgical team" or "The cardiac surgeon or the
cardiac team." Rather, the blanks in these instruc-
tions should have said "Dr. Yap" alone. Dr. Africa
could not be an ostensible agent of the hospital
and there was no evidence of negligence on the
part of any of the others on the so-called surgical
team assisting Dr. Yap. These instructions permit-
ted the jury to impose liability on the hospital
because Dr. Africa, as part of the surgical team,
did not obtain informed consent or because some-
one on the team, other than Dr. Yap or Dr. Africa,
was at fault despite an absence of any evidence to
support that. Also, because of the confusing nature

of the ostensible agency doctrine, the instructions should have included the hospital's request that the jury be instructed that actual agency was not claimed so the instructions would clearly explain that the hospital could only be held liable if it had created an appearance, reasonably relied upon by Mr. Strach, that Dr. Yap was one of its employees.

Perhaps our Supreme Court will accept this case to reconsider and limit the ostensible agency basis for liability without fault and will indicate what the instructions should be when such a claim is made.

The parties' injuries and damages are great and tragic, but it is also tragic to make a hospital pay, with interest, $2,000,000, more or less, for the result of an independent surgeon's malpractice, or failure to get an informed consent, when the unfortunate result was in no way the hospital's fault and when there is no just reason to hold it financially responsible.

Finally, I agree that the trial judge could allow plaintiffs' lawyer to ask leading questions of Dr. Africa even though it was apparent that Dr. Africa wanted to settle for the limits of his insurance to avoid personal liability. At the time of his testimony, Dr. Africa was technically an adverse party. However, I believe the Michigan Rules of Evidence, especially MRE 611, supersede the adverse witness statute, MCL 600.2161; MSA 27A.2161. Lawyers and judges should stop referring to the statute. The Michigan Rules of Evidence govern how witnesses are questioned.